760 P.2d 1276

STATE of New Mexico,
Plaintiff–Appellee,

v.

Melvin ESCAMILLA,
Defendant–Appellant.

No. 16849.

Supreme Court of New Mexico.

Aug. 17, 1988.

As Amended on Denial of Rehearing
Sept. 22, 1988.

Jacquelyn Robins, Chief Public Defender, Deborah A. Moll, Asst. Appellant Defender, Santa Fe, for defendant-appellant.

Grant L. Foutz, Gallup, Trial Counsel.

Hal Stratton, Atty. Gen., Gail MacQuesten, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

RANSOM, Justice.

Melvin Escamilla appeals his convictions for first degree murder of Regina Dahozy, attempted first degree murder of Jimmy Samuels, aggravated burglary, and larceny. His claim that the trial court erred in failing to submit to the jury his tendered instruction on aggravated battery of Samuels requires a recapitulation of the facts relied upon by defendant.

For two years, defendant had lived in harmony with Dahozy. He was described as thoughtful and conscientious, a good worker, and not the type to get into trouble with the law. On Sunday, May 5, 1986, however, following an argument with Dahozy, he moved out of the apartment they shared with their son and Dahozy's mother and brother at 310 East Logan, Gallup, New Mexico.

During the evening of May 7, defendant visited his good friend Samuels who lived at 310½ East Logan. From Samuels, defendant obtained five ephedrine pills, a stimulant available in over-the-counter drug products. Following defendant's departure, Samuels received a call from Dahozy asking for a ride home from work. Samuels left his apartment at about 10:30 p.m. to pick up Dahozy at her place of employment. In the meantime, at the apartment of his friend Gregory Ball, defendant learned from Ball that Dahozy had been seeing Samuels. At that disclosure, defendant put his head in his hands, began to cry and told Ball that he was "going to get him." He returned to Samuels' apartment and took a rifle and bullets that had been on a chair in the living room during defendant's earlier visit.

Shortly after defendant's departure, Ball left his apartment in search of defendant. At about 11:30 p.m., Ball located defendant on the roof of the apartment complex at 310 East Logan. Defendant told Ball that he was going "to get" Samuels. Defendant's conversation with Ball was not coherent and he appeared drugged. Thinking that defendant was going to shoot at Samuels and Dahozy with a BB gun, Ball walked up the street looking for Dahozy and Samuels in hopes of warning them.

Upon their return to the apartment complex, Samuels heard what he thought was a "pop" from the car's heater and understood Dahozy to say "ouch." He then realized that defendant was shooting at them from the roof. Samuels put himself over Dahozy while defendant fired about five shots at the car. Samuels got out of the car, ran toward the defendant and stood by the stairs. Samuels then ran away from the apartment complex and down the street. Dahozy left the car and started to run down the street. Defendant left the roof in pursuit and continued to take aim and to shoot at Dahozy numerous times.

Dahozy was taken to the hospital where she was pronounced dead on arrival. After an autopsy, it was determined that Dahozy had small wounds in her cheek, neck, and shoulder due to windshield fragments, that she had other non-fatal gunshot wounds in the arm and abdomen, and that she had suffered a single fatal bullet wound to the lungs. Samuels walked into the hospital emergency room and was treated by the physician on duty. Samuels had not realized he had been wounded until the police told him that he was bleeding. The emergency room physician bandaged several gunshot wounds and Samuels was discharged a day later in good condition. The physician testified that although Samuels' wounds were potentially life-threatening they did not, in actuality, pose any such danger to Samuels.

Defendant surrendered to police at his aunt's home without incident. In defendant's car was found a rifle and a bag upon which a suicide note had been written by defendant to his son. The "bag" had been alluded to by defendant in his earlier conversation with Ball.

*Aggravated Battery.*

■ Defendant tendered to the trial court an instruction on aggravated battery

which in essence required the State to prove that defendant intended to injure Samuels. The tender of this lesser included offense to the attempted murder of Samuels was refused by the trial court.[1] In support of his claim of error, defendant argues that, because his shots through the window of the car were deflected by the glass, they were less likely to cause death or great bodily harm than if they had been fired when Samuels was outside the protection of the car. He points to the testimony of the forensic pathologist who observed that the wounds inflicted upon Dahozy while in the car were less significant because the bullets had passed through the glass. When Samuels left the car and stood by the apartment he was not hit. He was able to run down the street without injury even though defendant was on a roof and presumably able to survey a wide area. Once Samuels left the car, defendant did not pursue him further, but rather turned his attention solely upon Dahozy. Defendant argues this evidence would support a conclusion that defendant had not intended to kill Samuels but had, if anything, intended only to injure him.

The test for determining whether a crime is a lesser included offense has been set out recently in *State v. Hernandez*, 104 N.M. 268, 720 P.2d 303 (Ct.App.), *cert. denied*, 104 N.M. 201, 718 P.2d 1349 (1986):

> [T]o permit an instruction to a lesser included offense, there must be evidence tending to establish the lesser offense * * *. Second, to permit an instruction on a lesser included offense, there must be some view of the evidence which could sustain a finding that the lesser offense was the highest degree of the crime committed.

*Id.* at 276, 720 P.2d at 311 (citing *State v. Fish*, 102 N.M. 775, 779, 701 P.2d 374, 378 (Ct.App.1985)); *see also State v. Southerland*, 100 N.M. 591, 673 P.2d 1324 (Ct.

App.), *cert. denied*, 100 N.M. 689, 675 P.2d 421 (1983).

Defendant relies upon the above-described evidence as tending to establish the lesser offense and, citing *State v. Omar-Muhammad*, 102 N.M. 274, 694 P.2d 922 (1985), argues that it is error for a trial court not to submit an instruction on a lesser included offense when there is some evidence introduced tending to reduce the offense. However, defendant does not consider the second prong of the *Hernandez* test which has been stated to be "whether the evidence showed anything less than intent to inflict an injury which created a high probability of death." *State v. Southerland*, 100 N.M. at 596, 673 P.2d at 1329. In the case of defendant, the evidence of several potentially life-threatening gunshot wounds showed nothing less than intent to inflict an injury which created a high probability of death.

But, what is determinative, the jury found that defendant had a deliberate intention to take the life of Samuels, not that he simply had knowledge that his acts created a strong probability of great bodily harm. The jury having failed to find the lesser included offense of attempted murder in the second degree, we deem the failure to instruct on aggravated battery to have been harmless. *See* SCRA 1986, 5–113(A) (error in any ruling by the court is not grounds for setting aside a verdict unless inconsistent with substantial justice); *accord Christie v. State*, 580 P.2d 310, 320 (Alaska 1978).

*Mandatory Life Imprisonment as Cruel and Unusual Punishment.*

■ Defendant challenges as unconstitutional NMSA 1978, Section 31–20A–1 (Repl. Pamp.1987), that mandates life imprisonment upon the conviction of first degree murder where the death penalty is not sought. This Court has held the mandato-

---

1. The trial court instructed on attempted murder in the first and second degree, requiring either a deliberate intention to take the life of Samuels or knowledge on the part of defendant that his acts created a strong probability of death or great bodily harm to Samuels. NMSA 1978, § 30–2–1 (Murder) and § 30–28–1 (Attempt); SCRA 1986, 14–201, 14–210 and 14–2801.

ry imposition of a life sentence for an habitual offender convicted of commercial burglary does not constitute cruel and unusual punishment. *State v. Archibeque*, 95 N.M. 411, 622 P.2d 1031 (1981). We find no good reason to hold otherwise in the instant case. In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court adopted a proportionality analysis of objective factors bearing upon cruel and unusual punishment. These factors include the gravity of the offense and the harshness of the penalty, the sentences imposed on other criminals in the same jurisdiction, and the sentences imposed for commission of the same crime in other jurisdictions. 463 U.S. at 292, 103 S.Ct. at 3010. *Solem* was acknowledged in *State v. Burdex*, 100 N.M. 197, 668 P.2d 313 (Ct.App.), *cert. denied,* 100 N.M. 192, 668 P.2d 308 (1983), wherein it was appropriately observed that the length of sentence is purely a matter of legislative prerogative, unless the statutory sentence is disproportionate to the offense involved. *Id.* at 202, 668 P.2d at 318. We find no disproportionality. Intentional murder warrants the harshest of penalties, and thirty years is mandated uniformly in first degree murder cases where death is not imposed. *See* NMSA 1986, § 31–21–10 (Repl.Pamp.1987) (defendant sentenced to life imprisonment as result of commission of capital felony becomes eligible for parole hearing after serving thirty years). It is uncontested that this mandatory sentence is not disproportionately harsh when compared to those in other states.

*Jury Irregularity.*

*Background and Issues.* During jury deliberation, defense counsel was informed that a member of the jury did not understand English. The juror in question had given no indication during voir dire that he was unable to understand English. After the jury rendered its verdict and was excused, defense counsel moved for a mistrial. Claiming error in the court's denial of a mistrial, defendant argues that his constitutional rights to a fair and impartial jury and to a unanimous verdict were abridged by allowing an unqualified juror to remain on the jury.

In support of his claims of error, defendant has filed with this Court affidavits [2] indicating that members of the jury notified the bailiff that a fellow juror could not understand English and that the bailiff communicated this to the judge. The judge told the bailiff that he knew the juror in question and that the juror did understand English. This exchange took place outside the presence of the defendant and counsel. The trial court did not conduct any further inquiry or hearing into the ability of this juror to understand English, but instructed the jury that this juror did understand English and to continue its deliberation. The other jurors were nonetheless required to translate for this juror during its deliberation as to the guilt or innocence of the defendant.

We are faced with the fact that the trial court denied the motion for mistrial without a hearing. No record was made in the court below except for the motion for mistrial made after the jury rendered its verdict and was excused. Defendant's counsel supported the motion for mistrial with no evidentiary bases other than his "understanding" that a juror did not understand English. No offer of proof was made. Moreover, a jury poll taken at the defendant's request found the verdict unanimous as to all counts.

The issues raised under this claim of error include (1) right to be present in the event of communications with the jury, (2) right to a fair, impartial, and unanimous twelve-person verdict, (3) waiver of fundamental rights, and (4) necessity for hearing. Defendant supports his position with the following cases: *Hovey v. State*, 104 N.M. 667, 726 P.2d 344 (1986); *Mares v. State*, 83 N.M. 225, 490 P.2d 667 (1971); *State v. Holloway*, 106 N.M. 161, 740 P.2d 711 (Ct.App.), *cert. denied,* 106 N.M. 405,

---

**2.** As to the absence of a record, see discussion below under *Necessity for hearing.*

744 P.2d 180 (1987); and *State v. Gallegos,* 88 N.M. 487, 542 P.2d 832 (Ct.App.), *cert. denied,* 89 N.M. 6, 546 P.2d 71 (1975).

In *Hovey,* several communications were sent by the jury to the judge regarding issues of the case. Each time defense counsel waived the presence of the defendant and, without objection, consented to the answers sent back to the jury. All questions from the jury and the conferences between the court and both attorneys to formulate written responses were made part of the record and took place during jury deliberations. This Court held that the communications outside the presence of the defendant gave rise to a presumption of prejudicial error which the state did not overcome.

In *Mares* a new trial was allowed because of a juror disqualification not discovered until after the verdict. The defendant had a right to trial by an impartial jury. If the juror had answered appropriately in voir dire, at least to such an extent as would have put counsel on further inquiry, counsel could have probed the qualifications.

The issue in *Holloway* was whether the defendant's convictions resulted from a unanimous jury verdict where one juror, when polled, asked whether she could qualify her verdict. The defendant contended the question asked by the juror at the time of polling indicated that the verdict of the jury was not unanimous. The state argued, relying on SCRA 1986, 5–611(F) (no irregularity in rendition or reception of verdict may be raised unless raised before jury is discharged), the defendant waived any right to challenge the unanimity of the verdict by failing to specifically object or request remedial action prior to the court's recording of the verdict. The irregularity in *Holloway* occurred on the record and before the jury was excused. The court of appeals, recognizing the *Holloway* issue as one of first impression in New Mexico, found no waiver by defendant of his right to challenge the unanimity of the verdict.

The court held that the juror's response while being polled signaled the district court that more than a mere technical irregularity existed and the court should have exercised its discretionary power to take remedial measures to ascertain and assure that the verdict was unanimous.

In *Gallegos,* shortly after jury deliberations began, the jury sent to the trial court three notes. The third note read: "The juror does not understand English very well, and upon being questioned in Spanish, the jury has found that he/she does not even understand the charges brought against the Defendant." After defense counsel's motion for mistrial was denied, the trial court sent the jury back to deliberate. The court reasoned that:

once the jury was sworn, neither the court nor the attorneys could 'go behind the qualifications of the juror' * * *. The jury was brought back into the courtroom and instructed that since they had been questioned by the court and the attorneys [on voir dire] and that since none of them had responded to various negative questions which had been asked them, they were qualified. The trial court stated that it would not be proper to go behind and inquire into the qualifications of any of them. The court further informed the jury that the time to check into such matters was before the oath had been administered, and that it was too late to do so after the cause had already been submitted for verdict.

88 N.M. at 488, 542 P.2d at 833. In reversing the defendant's conviction, the court of appeals held that the fundamental right to jury trial by an impartial jury[3] was violated when "one unqualified juror [was allowed] to serve in a criminal case for the reason that any verdict rendered in such a situation would be less than unanimous." 88 N.M. at 489, 542 P.2d at 834. The court further stated that "[u]pon receipt of the third note * * * the trial court should have conducted a summary hearing to determine for itself the ability of the juror in question to understand English." *Id.*

3. *See* N.M. Const. art. II, §§ 12 & 14.

*Waiver by Waiting to Object to Juror Qualification until after Verdict Rendered and Jury Excused.* Although the general rule in New Mexico does not permit review of a question not properly preserved below, an appellate court, nonetheless, may consider questions involving fundamental rights of a party and fundamental error. SCRA 1986, 12–216. While fundamental rights call for discretionary review, fundamental error calls for a new trial. There is a difference, then, between a fundamental right and fundamental error. *State v. Sanchez,* 58 N.M. 77, 84, 265 P.2d 684, 688 (1954). The latter cannot be waived. *Id.* The doctrine of fundamental error is one to be applied only under exceptional circumstances and solely to prevent a miscarriage of justice. *State v. Tipton,* 73 N.M. 24, 385 P.2d 355 (1963). On the other hand, most rights, however fundamental, may be waived or lost by the accused. *Sanchez,* 58 N.M. at 84, 265 P.2d at 688.

■ There is no question that the right to trial by a fair and impartial jury is a fundamental right. *Id.* However, this Court has held that a defendant, by accepting the juror after qualifications have been examined on voir dire, waives his right to object to jury qualifications *after* the verdict is rendered. *State v. Costales,* 37 N.M. 115, 19 P.2d 189 (1933); *see also People v. Crespin,* 635 P.2d 918 (Colo.App. 1981) (challenge for cause is waived if counsel does not use reasonable diligence on voir dire to determine if challenge for cause exists); *Perkins v. State,* 695 P.2d 1364 (Okla.Crim.1985) (counsel had duty to examine jurors on voir dire and discover by proper investigation the facts affecting juror qualifications and then seasonably raise any objection); *but see Gallegos.* It has also been held that a defendant who possesses information regarding a juror's qualifications before the jury renders its verdict gambles on the outcome by waiting until the guilty verdict has been rendered before moving for a new trial. *People v. Lewis,* 180 Colo. 423, 428, 506 P.2d 125, 127 (1973); *see also State v. Paxton,* 201 Kan.

353, 440 P.2d 650 (1968) (if question of juror qualifications is not raised until after verdict is rendered it is too late and not available for purpose of defendant obtaining new trial); *Smith v. State,* 651 P.2d 1067 (Okla.Crim.1982) (disqualification which could be discovered before verdict by reasonable diligence may not be made subject of attack upon entry of verdict).

A review of the record indicates that defendant had an opportunity to raise the juror qualification issue before the jury rendered its verdict and was dismissed. Defense counsel's knowledge was acquired while the jury was deliberating, yet he waited to move for a mistrial until he knew the verdict. If waiver of an objection to the juror's qualifications were all that was before us, we would be inclined to find that the defendant gambled on the verdict and cannot now complain.

*Necessity for hearing.* While it is not clear whether communications between court and jury came to the attention of defense counsel before the jury was dismissed, the committee commentary to SCRA 1986, Section 5–610(D) appropriately states that "[a]ll communications between the judge and the jury should be made a part of the record, whether made in the presence of defense counsel and defendant or not." We agree with that commentary. The court has that responsibility irrespective of counsel's action.

The scope of appellate review by the supreme court is limited to consideration of those matters disclosed by the record, *State v. Buchanan,* 78 N.M. 588, 435 P.2d 207 (1967), and matters outside the record present no issue for review. *State v. Smith,* 92 N.M. 533, 591 P.2d 664 (1979) (citing *State v. Romero,* 87 N.M. 279, 532 P.2d 208 (Ct.App.1975). The reviewing court will not go outside the record in a criminal case. *State v. Curlee,* 98 N.M. 576, 651 P.2d 111 (Ct.App.), *cert. denied,* 98 N.M. 590, 651 P.2d 636 (1982); *State v. Colvin,* 82 N.M. 287, 480 P.2d 401 (Ct.App. 1971). In New Mexico, affidavits attached to the docketing statement which were not

**516**

brought to the trial court's attention will not be considered by the reviewing court. *State v. Lucero*, 90 N.M. 342, 345, 563 P.2d 605, 608 (Ct.App.), *cert. denied*, 90 N.M. 636, 567 P.2d 485 (1977).

 We remand for the court to certify the record as to the details of any communications between the court and jury and to conduct an evidentiary hearing into whether the State can overcome a presumption of prejudice from defendant's absence during communications, if any, between the court and jury, and to determine whether defendant was accorded his right to a jury of twelve. Irrespective of proper preservation of error by defendant, we are satisfied that it was the duty of the trial court to make a record and rule upon any possible miscarriage of justice that could constitute fundamental error. *See* Rule 5–610(D) (committee commentary); *Hovey; Mares; Holloway;* and *Gallegos.*

If the court finds prejudice to defendant from his absence during jury communications or from a juror's inability to understand English, then the court should grant a new trial *unless* the court further finds no fundamental error and that the rights in question were waived. The trial court should also hear evidence on the competency of counsel issue. Defendant may appeal de novo to this Court the denial of a new trial in order that we may review the competency of counsel issue which was raised but not herein considered, or whether reversible error may otherwise appear on the record made below. It is only on a proper record that we may exercise discretion to consider fundamental rights that may have been infringed without preservation of error, or on which we may consider fundamental error.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and WALTERS, J., concur.