788 P.2d 352

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Darci Kayleen PIERCE,
Defendant–Appellant**

No. 17813.

Supreme Court of New Mexico.

Feb. 27, 1990.

Jacquelyn Robins, Chief Public Defender and Bruce Rogoff, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Hal Stratton, Atty. Gen. and Katherine Zinn, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Chief Justice.

Defendant-appellant, Darci Pierce, was found guilty but mentally ill of first-degree murder, kidnapping and child abuse. The crimes were committed on July 23, 1987. Appellant was sentenced to life imprisonment for first-degree murder, eighteen years for kidnapping, and eighteen months for child abuse. The sentences were to run concurrently. Our statutes pertaining to a verdict of guilty but mentally ill and sentencing thereon are, respectively, NMSA 1978, Sections 31–9–3 and 31–9–4 (Repl. Pamp.1984).

The record shows that Appellant is and has been for a long period of time a mentally unstable person. Prior to the crimes for which she was convicted, she told various persons, including her husband and doctors, that she was pregnant, when in fact she was not. During the months preceding the crimes, she became increasingly obsessed with the desire to have a baby. She kidnapped the victim, who was a pregnant woman near her date of delivery. Appellant took the victim to a remote spot, strangled her in successive stages in order to keep her alive but unconscious, while Appellant performed a crude cesarean section delivery on the victim. Appellant then took the newborn infant from the victim's body, leaving the victim to bleed to death. Appellant at first claimed the baby as her

own, then, that of a surrogate mother, but eventually confessed to police what she had done and led them to the scene of the murder.

Appellant raises five points of error on appeal: (1) that a prospective juror concealed material facts during interrogation on voir dire and that the court erred in not granting a new trial on this issue following proper defense motion; (2) that the court's instructing the jury on felony murder deprived Appellant of due process and a fair trial in that it lessened the degree of *mens rea* required to be shown by the State on the separate charge of first degree murder; (3) that the court's instruction on a verdict of not guilty by reason of insanity violated due process by improperly shifting the burden of proof on this question to Appellant; (4) that the court erroneously modified a uniform jury instruction pertaining to the definition of "mentally ill" and failed to track the language of Section 31-9-3 when instructing the jury on a verdict of guilty but mentally ill; (5) that the prosecutor's questioning of an expert defense witness on her having testified for the defense in another murder trial denied Appellant due process and a fair trial. We address each of these issues in turn.

## I. THE JUROR'S ALLEGED CONCEALMENT OF A MATERIAL FACT AND THE COURT'S DENIAL OF THE DEFENSE MOTION FOR A NEW TRIAL.

 The colloquy between the court and the juror on voir dire proceeded as follows:

*Court:* [H]ave you ever had to be treated by a psychiatrist or psychologist for any reason?

*Juror:* Not that I remember, your Honor. Not that I can remember * * * [A]t one time, I had * * * kind of a dizzy spell, and they thought that I needed a psychiatrist, and finally a *doctor got ahold of me* and took care of me. So I didn't have to have a psychiatrist.

The day after the verdict was returned, the juror was quoted in a newspaper as saying:

I was mentally sick—It caused me to go berserk at 12 or 13. I had to go to a hospital for a year. That's why it was so easy to judge her case. I've seen people who were 10 times worse than she was go into mental hospitals and be cured.

Based on this statement, Appellant filed a motion for a new trial. At the hearing on the motion, the juror testified that his father had hit him with a board when he was young, and that this traumatic event caused him to be unable to talk and resulted in his being hospitalized for depression. When asked if the person who helped treat him in the hospital had been a psychiatrist or psychologist, the juror responded, "No, no, no, because they was not dealing with my mind. They was dealing with my speech because I knew what was wrong."

He stated further that it was not medical treatment that healed him, but a "beautiful experience" in which "the Lord Jesus Christ, the living God, healed me. That is the experience that I have received." He denied having told the newspaper reporter that he had once been mentally sick or that he had gone berserk. He further testified that he could see the devil in the Appellant. He continued, "I saw in her right away, I saw in her witchcraft. I saw in her rebellious. I saw in her murder * * * I saw in her all these things because I am a spiritual man." The juror continued to maintain that he had never been treated by a psychiatrist, that he had not falsely answered any question put to him by the court on voir dire, and that he had made his decision on the verdict based on the evidence presented at trial.

At the conclusion of the hearing, the court denied the motion for new trial, stating the following:

The Court will find that the Defense has failed to establish, to the satisfaction of the Court, that there were any material misrepresentations, misrepresentations or false statements of fact in the Voir Dire Examination. Also, that the Defendant's [sic] have failed to establish to the Court's satisfaction that actual prejudice has been shown by [the juror's] having been seated as a juror. The Court might

just comment that he may not be the type of juror that most of us would want sitting on our cases, but that also is questionable. It could have been that the Defense might have rather had persons who had undergone psychiatric treatment or had mental illnesses, and they may have been more favorable to the Defendant's situation, as opposed to persons who had not experienced that type of illness themselves or in their families.

Also, the Court might just comment that I can easily understand how there may have been misunderstandings between what [the juror] said to the reporter and how the reporter understood them. It's difficult to follow [the juror] here as to how he testified and what he really meant. And it took a lot of explanation, and I am not sure that any of us still really understand and comprehend just what he is trying to say in all respects. According to [the juror's] testimony, as far as he's concerned, he never was treated by a psychiatrist or psychologist.

The standard for review of this issue is based on two cases, each involved with the same defendant and the same set of facts. *State v. Baca,* 99 N.M. 754, 664 P.2d 360 (1983), and *Baca v. Sullivan* 821 F.2d 1480 (10th Cir.1987). After we affirmed the conviction in *State v. Baca,* the defendant petitioned in *Baca v. Sullivan* for a writ of habeas corpus to the United States District Court for the District of new Mexico. The petition was dismissed, and on appeal to the United States Court of Appeals for the Tenth Circuit, the dismissal was affirmed.

In *State v. Baca,* a juror falsely answered "no" to a jury questionnaire in which he was asked if any member of this family "past or present" had served in a law enforcement agency. In actuality, his brother had served over thirty years on the Albuquerque police force before retiring. The juror also checked "criminal" on the questionnaire when in fact he had previously served on a jury trying a civil suit. Finally, when the panel was asked on voir dire if anyone had a relative or close friend "who might work for a police department," the juror remained silent, presumably because the question was phrased in the present tense and did not require him to answer.

As in the case before us, in *State v. Baca,* when the juror's inaccurate responses came to light, the defendant sought a new trial. In denying the motion for new trial, the trial court found that the juror's false answer to the question about his brother's service on the police force was not relevant to the juror's ability to serve as an impartial juror. In reviewing the record in that case we held there were not "such relevant and material facts present in the case that might bear on possible disqualification of the juror, so that it could be asserted that the defendant's trial was conducted in an atmosphere of bias or partiality." *Id.,* at 756, 664 P.2d at 362. In reviewing the trial court's hearing of the motion for new trial, we held, "Where there is nothing to indicate either manifest error or abuse of discretion by the trial court, in permitting [the juror] to serve as a juror, the trial court's decision will not be disturbed on appeal. The burden of establishing partiality is upon the party making such a claim." *Id.* (citations omitted).

In its review of the case, the United States Court of Appeals for the Tenth Circuit focused both on the irrelevance of the juror's answer to his service as an impartial juror and the failure of the defendant to show actual prejudice. Similar to the appellant's position at oral argument in the case at bar, the defendant in *Baca v. Sullivan* argued before the Court of Appeals that the juror's false answer deprived defendant of a peremptory challenge. The Court of Appeals rejected that argument, relying on *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 555, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984). In *McDonough,* the Supreme Court held both that a challanged juror must be shown to have answered dishonestly a material question on voir dire, and that had the juror given a correct response, the answer would have been grounds for a challenge for cause. Finally, the Court of Appeals relied on *United States v. Perkins,* 748 F.2d 1519, 1532 (11th Cir.1984), as support for the proposition that " '[a] party who seeks

a new trial because of non-disclosure by a juror during voir dire must show actual bias.'" *Baca v. Sullivan,* 821 F.2d at 1483.

Appellant argues that *Mares v. State,* 83 N.M. 225, 490 P.2d 667 (1971), supports her contention that it makes no difference whether the juror in the case before us *mistakenly* or *willfully* stated he had never seen a psychiatrist or a psychologist. In *Mares* a prospective juror had disclosed on voir dire that he had long been a friend of the complaining witness, but had failed to disclose in addition that he had been in the witness' home on the date of the crime, when police officers were present seeking fingerprints. In *Mares,* we held that unintentional fault on the part of the challenged juror made no difference, so long as the defendant was prejudiced. We reversed the conviction and ordered a new trial. We agree with Appellant that *Mares* is still good law despite *Baca v. State* and *Baca v. Sullivan,* but we disagree with her that *Mares* compels us to reach a different result than that reached in the *Baca* cases.

■ First, unlike the situation in *Mares,* we find no relationship in the case before us between the juror's erroneous answer and his capacity to sit as an impartial juror. We agree with the trial court that had the juror told the court that he had had prior psychiatric or psychological therapy, it may have been interpreted by Appellant as a helpful response. Whatever remarks the juror may later have made to a newspaper reporter, the trial court was bound to consider only the juror's in-court statements. Had those statements indicated prior psychological treatment, it is not clear that the defense would have regarded him as an unfavorable juror. The defense only later came to regard the juror as unfavorable, and solely because of certain remarks he made to a journalist, a portion of which the juror later denied having made.

Thus, second, we find no actual prejudice to Appellant stemming from the juror's answers on voir dire. It is true that after trial the juror made certain eccentric remarks about his ability to judge Appellant's character. However, the issue at the hearing on motion for new trial was whether the juror had misled the court in giving false answers as to his supposed prior psychiatric or psychological treatment. In conducting the hearing on the motion for new trial the court was limited to that issue and to the issue of the juror's impartiality. At the hearing on the motion, the juror testified that he arrived at his verdict on the basis of the evidence presented at trial, and not on the basis of what he had known about former mental patients he may have seen, or about his ability "to see the devil in the Appellant." When asked by defense counsel if his experience with former mental patients had given him "special insights as to whether [Appellant] was insane," the juror answered, "No, no. Like I said, at that time when I was sitting as a juror, it did not even enter—it didn't enter my mind at all."

■ Finally, in response to the issue raised by Appellant at oral argument as to her right to have peremptorily challenged the juror, we agree with the court in *Williams v. United States,* 418 F.2d 372, 377 (10th Cir.1969), that "[t]he fact that [the] juror * * * might have been peremptorily challenged by defendant is not alone sufficient to reverse defendant's conviction."

We thus hold: (1) assuming that the juror made the alleged misrepresentations on voir dire, whether intentionally or unintentionally, his statements were not germane to his capacity to sit as an impartial juror; (2) assuming the juror made the alleged misrepresentations, Appellant has not shown how she was actually prejudiced by the juror's sitting on the jury; (3) Appellant was not entitled as a matter of law to have exercised a peremptory challenge to strike the juror from sitting on the jury; and (4) the trial court soundly exercised its discretion in denying the motion for new trial. Appellant, as to this issue, has not shown reversible error.

II. THE COURT'S INSTRUCTION ON FELONY MURDER AND ITS EFFECT ON THE JURY'S CONSIDERATION OF APPELLANT'S INTENT TO COMMIT FIRST–DEGREE MURDER.

■ The court instructed the jury on first-degree murder, in pertinent part, as follows:

For you to find the defendant guilty of first degree murder by deliberate killing * * * the state must prove * * * each of the following elements of the crime:

1. The defendant killed [the victim];
2. The killing was with the deliberate intention to take away the life of [the victim];

 * * * * * *

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing * * * * To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

The court likewise instructed the jury on felony murder, in pertinent part, as follows:

For you to find the Defendant guilty of felony murder, which is first degree murder, as charged in the alternative to Count I, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The Defendant committed the crime of kidnapping;
2. During the commission of kidnapping, the Defendant caused the death of [the victim];

Appellant contends that the court's instructing the jury in the alternative as to first-degree murder and felony murder made the prosecution's burden lighter in that the prosecution did not have to show *mens rea*, or the necessary state of mind, for first-degree murder, and that this lesser burden deprived Appellant of a fair trial.

■ First of all, as our court of appeals has correctly held:

When a death occurs during the commission of an inherently dangerous felony, the prosecution bears no burden of proving intent to kill. Rather, the requisite malice aforethought can be inferred from the commission or attempted commission of the felony * * * * Thus, the determination of whether felony murder has been properly charged does not turn on

whether the murder was intentionally or unintentionally committed; felony murder simply contains no *mens rea* requirement.

*State v. Price*, 104 N.M. 703, 726 P.2d 857 (Ct.App.), *cert. quashed*, 104 N.M. 702, 726 P.2d 856 (1986), citing *State v. Harrison*, 90 N.M. 439, 564 P.2d 1321 (1977); *Head v. State*, 443 N.E.2d 44 (Ind.1982).

The fact that felony murder has no *mens rea* requirement, however, does not lessen the *mens rea* requirement for the separate crime of first-degree murder, as is shown by the detailed instruction given by the court, quoted above, on the intention needed to establish first-degree murder as a separate crime.

■ Appellant would apparently have us do away with the doctrine of felony murder, an option we faced in *Harrison* but declined to choose. We reiterate our holding in *Harrison:* Where the felony supporting felony murder is inherently dangerous, and where it is independent of the act causing the death of the victim, it may be used to support an alternative count of felony murder against a defendant charged separately with first-degree murder.

The felony relied on here, kidnapping, was obviously an inherently dangerous crime, for the victim was taken against her will at Kirtland Air Force Base with the intent to hold her for service against her will—namely, to extract the victim's unborn child from her womb. The victim was driven to a spot several miles away from Kirtland, to a location where the baby was delivered and the murder was committed. The kidnapping and the murder were separate acts. Taking the victim for service against her will did not kill her. Strangling the victim and allowing her to bleed to death killed her. In this case, the kidnapping and the murder were separate and individual crimes. By the test adopted in *Harrison*, the trial court did not commit error in instructing the jury in the alternative on first-degree murder and felony murder.

### III. THE COURT'S INSTRUCTION ON A VERDICT OF NOT GUILTY BY REASON OF INSANITY.

▇ The disputed instruction reads, in pertinent part, as follows:

There is an issue in this case as to the Defendant's mental condition at the time the acts were committed. You will be given alternative verdict forms for each crime charged as follows:

\* \* \* \* \* \*

Not guilty by reason of insanity.

\* \* \* \* \* \*

You will first consider whether the Defendant committed the crime. If you determine that the Defendant committed the acts charged, but you are not satisfied beyond a reasonable doubt that she was sane at the time, you must find her not guilty by reason of insanity.

Appellant contends that by instructing the jury first to consider whether Appellant committed the "crime" and *then* to determine whether she was sane at the time "the acts charged" were committed, the court deprived her of due process. Appellant reasons that by having the jury determine whether a crime was committed before considering Appellant's sanity turns the burden of proof "on its head." Appellant contends that the jury could not determine whether a crime had been committed until it had first determined whether Appellant was sane or insane. Thus, Appellant concludes, the above instructions deprived her of a fair trial.

We find it hard to understand why the court erred by phrasing the instruction in the way it did when Appellant's own tendered instructions likewise first ask the jury to find whether the defendant is guilty of the crimes of kidnapping and first-degree murder, and then asks the jury to determine if the defendant was "not guilty by reason of insanity." The court's instruction was patterned on SCRA 1986, 14–5101, which states:

You will first consider whether the defendant committed the crime. If you determine that the defendant committed the act charged, but you are not satisfied

beyond a reasonable doubt that [s]he was sane at the time, you must find [her] not guilty by reason of insanity.

There is no disparity between the court's instruction and the uniform instruction. Further, the propriety of the jury's consideration of the crime charged before its consideration of the defendant's sanity has long been settled. *State v. James,* 83 N.M. 263, 267, 490 P.2d 1236, 1240 (Ct.App.1971).

### IV. THE COURT'S MODIFICATION OF THE UNIFORM INSTRUCTION AND ITS FAILURE TO TRACK THE WORDS OF NMSA 1978, 31–9–3, AS REQUESTED IN DEFENDANT'S INSTRUCTION NO. 3.

▇ SCRA 1986, 14–5103, the uniform jury instruction at issue, reads:

The defendant was mentally ill at the time of the commission of the crime if a substantial disorder of thought, mood or behavior impaired [her] judgment at the time of the commission of the offense. If you find beyond a reasonable doubt that the defendant committed the *act* charged you may find [her] guilty but mentally ill at the time of the commission of the offense. (Emphasis added.)

▇ The court's actual instruction reads word for word the same as the above, except that in the actual instruction the word *offense* was substituted for the word *act* in the second sentence. Appellant contends that this change deprived her of a fair trial. Second, Appellant contends that the instruction did not track the language of NMSA 1978, Section 31–9–3(D), and specifically, Appellant's version of that section, which was tendered as Defendant's Requested Instruction No. 3, reading as follows:

You may find the Defendant guilty but mentally ill if you find beyond a reasonable doubt that the Defendant:

1) is guilty of the offense charged;
2) was mentally ill at the time of the commission of the offense; and
3) was not legally insane at the time of the commission of the offense.

The portion of the statute in question reads identically to the words used by Appellant, except that the preamble in the statute reads as follows:

> When a defendant has asserted a defense of insanity, the court may find the defendant guilty but mentally ill if after hearing all of the evidence the court finds beyond a reasonable doubt that the defendant: [then follow the three requirements listed by Appellant above in her requested Instruction No. 3].

Appellant contends that the instruction given by the court should have included the words contained in Defendant's Requested Instruction No. 3, or that it should have tracked the statute. In summary then, Appellant contends that by changing the uniform jury instruction (14–5103), and by not giving Defendant's Requested Instruction No. 3 ("tracking the statute," Section 31–9–3), Appellant was deprived of a fair trail.

At the time when the court discussed jury instructions with the parties' attorneys, Appellant's attorney stated on the record as follows: "We did strongly object to the word *act* * * * *". The court then stated, "I changed that to *offense*—committed the *offense* charged, which is what you asked me to do." Appellant cannot be heard now to object to a change in the court's instruction which she herself through her attorney asked the court to make.

As to the issue raised by the statement in Section 31–9–3 to the effect that the court "shall separately instruct the jury that a verdict of guilty but mentally ill may be returned instead of a verdict of guilty or not guilty," the court by giving the uniform instruction (SCRA 1986, 14–5103), and the other instructions discussed above, did precisely what the statute calls for. The statute does not say that the instruction must replicate itself in the instruction so given. We prepared SCRA 1986, 14–5103 *after* the enactment of Section 31–9–3 precisely for the purpose of giving trial courts a uniform instruction to meet the requirements of Section 31–9–3. The court committed no error in giving the uniform instruction and in not tracking the language of Section 31–9–3 as requested by Appellant in her Requested Instruction No. 3.

## V. THE PROSECUTOR'S QUESTION TO AN EXPERT DEFENSE WITNESS

▄▄ The question objected to by Appellant occurred during the following exchange between the prosecutor and the expert witness:

Q. And you've been called upon often to testify in murder cases on behalf of the Defense, haven't you?

A. Yes.

Q. And, in fact, you've testified or you did testify in the case involving William Wayne Gilbert, didn't you, for the Defense?

At that point Appellant's attorney objected and the objection was sustained. In a bench conference, the court instructed the prosecutor as follows: "You can go in to [sic] whether or not she testifys [sic] for the Defense. It's an attempt to show bias. But you can't cite specific cases unless you're going to use that testimony in that [sic] case for some reason." The witness never answered the question about having testified in the Gilbert case, and Appellant's attorney did not seek to have the court admonish the jury concerning the question. We fail to see how Appellant was prejudiced by the prosecutor's question, which lay unanswered, and even if it had been answered in the affirmative would have been of dubious prejudicial value. The prosecutor's question was hardly fundamental error requiring a new trial.

For the foregoing reasons we affirm the judgment and sentence of the trial court in its entirety.

IT IS SO ORDERED.

RANSOM, J., specially concurs with opinion.

BACA, J., concurs.

MONTGOMERY, J., dissents with opinion in which WILSON, J., joins.

RANSOM, Justice (specially concurring).

I concur that a new trial should be denied and that the judgment and sentence of the trial court should be affirmed. I wish, however, to express my view of a distinction to be made when jury selection is implicated and when it is not implicated in a defendant's claim that a juror has been disqualified by bias or otherwise, or that deliberations have been tainted.

*Jury selection implicated.* In general, if a defendant makes a prima facie showing that a juror misrepresented a material fact during voir dire, then the defendant is entitled to an evidentiary hearing as to whether the juror did, indeed, expressly or tacitly misrepresent a material fact.[1] If the juror did not do so, then defendant is entitled to no new trial and the inquiry is at an end, unless, alternatively, as I believe to be the case at hand, there also is a claim of disqualification in which voir dire is not implicated.

If the juror did expressly or tacitly misrepresent a material fact, then the defendant is entitled to an evidentiary hearing on whether the misrepresentation was dishonest or simply an inadvertent mistake. If the answer was a dishonest one, then a new trial is required under the sixth amendment to the Constitution.[2] If the answer was not dishonest, the defendant yet is entitled to an evidentiary hearing as to whether a disqualification (related to the misrepresentation) is actually or presumptively present, i.e., its disclosure on voir dire would have required excusal.[3] If so, then a new trial is required. If not, then no new trial is required.

*Jury selection not implicated.* Evidence Rule 11–606(B), like its federal counterpart, provides that jurors are incompetent to testify about their deliberations, emotions, or the effect of anything on their state of mind while deliberating, except that jurors may testify concerning extraneous prejudicial information or outside influence.[4] This rule does not apply, however, to the above-discussed question of dishonesty or bias connected with misrepresentations on voir dire.[5]

While misrepresentations made on voir dire may indicate sixth amendment constitutional defects in the jury selection process, the express exceptions to Rule 606(B) allow a defendant to raise a fifth amendment due process challenge to alleged taints in the jury deliberation process.[6] If

1. *See Mares v. State,* 83 N.M. 225, 490 P.2d 667 (1971) (right to impartial jury implicated when juror has mistakenly or willfully misrepresented material fact during voir dire); *United States v. Perkins,* 748 F.2d 1519 (11th Cir.1984) (defendant entitled to evidentiary hearing upon making prima facie showing that juror misrepresentation during voir dire deprived defendant of right to impartial jury).

2. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

3. *Id.* at 556, 104 S.Ct. at 850 (Justice Blackmun concurring, joined by Justices Stevens and O'Connor); *see generally Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, Justice, concurring) (no finding of bias necessary when presumed or implied bias exists because, e.g., a juror is employed by the district attorney's office, is a close relative to one of the participants, is a witness, or is involved in some manner in the criminal transaction at issue).

4. *See United States v. Tanner,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (discussing Rule in detail, but concluding that allegations of

alcohol and drug use by jurors did not constitute allegation of external influence).

5. *State v. Martinez,* 90 N.M. 595, 566 P.2d 843 (Ct.App.1977); *Brofford v. Marshall,* 751 F.2d 845, 853 (6th Cir.) (en banc), *cert. denied,* 474 U.S. 872, 106 S.Ct. 194, 88 L.Ed.2d 163 (1985); *see generally* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 606[04], at 606–33 (1989).

6. *State v. Sacoman,* 107 N.M. 588, 590–92, 762 P.2d 250, 252–54 (1988) (extraneous information created a presumption of prejudice that the trial court reasonably found to have been overcome); *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (right to fair trial required evidentiary hearing and determination of prejudice). Extraneous prejudicial information and outside influence also may implicate the defendant's sixth amendment right to confront evidence. *Parker v. Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (prejudicial remarks by bailiff to jurors). The *Parker* Court noted that the bailiff's unauthorized conduct also "involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 365, 87 S.Ct. at 471 (quoting *Estes v. Texas,* 381 U.S.

the claim is not within the Rule 11–606(B) extraneous information or outside influence exceptions, some courts, ours among them, hold the defendant still is entitled to an evidentiary hearing, at least when the offer of proof constitutes a clear, strong showing that a juror's disqualifying state of mind resulted in a deprivation of the sixth amendment right to an impartial jury.[7] If such a showing is made, then the defendant is entitled to an evidentiary hearing as to whether a disqualification is actually or presumptively present.[8] Arguably, that was the state of things here.

It is only the due process inquiry, under the express exceptions to Rule 606(b), that turns on whether there was prejudice to the defendant. If a defendant makes a preliminary showing of the existence of extraneous prejudicial information or outside influence that implicates a due process violation, the court must conduct a hearing to determine the existence of a taint on the jury deliberation process.[9] The introduction of extraneous prejudicial information or the presence of improper outside influence creates a presumption of prejudice.[10] If, at the hearing, the trial court finds a

532, 542–43, 85 S.Ct. 1628, 1637–38, 14 L.Ed.2d 543 (1965)).

**7.** *Sacoman,* 107 N.M. at 590–93, 762 P.2d at 252–55. One of the claims of extraneous prejudicial information in *Sacoman* involved a story fabricated by one of the jurors on the final day of deliberations that tended to undermine the defendant's alibi defense. We analyzed this claim first in terms of its prejudicial impact on the verdict. *Id.* at 592, 762 P.2d at 254. We also addressed the defendant's claim that the juror's misconduct in fabricating the story and in perjuring herself when initially asked about the incident by the trial court established a disqualification of the juror for dishonesty and bias. Under the circumstances, we concluded that the juror's misconduct reasonably could be found to have been motivated only by her appraisal of the evidence heard at trial and her desire for peer recognition, and therefore affirmed the trial court's ruling denying the defendant's motion for a new trial. *Id.* at 593, 762 P.2d at 255. *See also Brofford v. Marshall,* 751 F.2d at 853–54 (further inquiry not warranted by unnotorized juror statement that, after trial, she found herself unable to return verdict of other than guilty given extent of pretrial publicity in case, notwithstanding her good faith answer to question on voir dire that she could be impartial); *King v. United States,* 576 F.2d 432, 438 (2d Cir.) (weakly authenticated, vague, and speculative material attributed to juror was not a clear, strong showing that warranted further inquiry), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Dioguardi,* 492 F.2d 70 (2d Cir.1974) (allegation of juror incompetence), *cited with approval in United States v. Tanner,* 483 U.S. at 125, 107 S.Ct. at 2750.

Some courts have suggested that Rule 606(B) creates an absolute bar to post-verdict testimony of this sort. *See, e.g., United States v. Duzac,* 622 F.2d 911, 913 (3d Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). In *Shilcutt v. Gagnon,* 827 F.2d 1155, 1159 (1987), by contrast, the court limited itself to consideration of whether a racially biased remark prejudicially affected the verdict. 827 F.2d at 1159.

*Cf. Wright v. United States,* 559 F.Supp. 1139, 1151–52 (E.D.N.Y.1983) (allegation that juror was racially biased should be considered on case-by-case basis to avoid trampling the sixth amendment guarantee to a fair trial and impartial jury), *aff'd,* 732 F.2d 1048 (2d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985).

**8.** If either a sixth amendment disqualification or a fifth amendment taint is present, it must be determined whether actual or constructive notice of the disqualification or taint was had by the defendant before the verdict was rendered. If not, then a new trial is required. If notice of disqualification or taint was had prior to verdict, then it must be determined whether the defendant preserved error. If he did, then a new trial is required. If error was not preserved, then defendant would be entitled to a new trial only upon a finding of fundamental error. *See State v. Escamilla,* 107 N.M. 510, 760 P.2d 1276 (1988) (even when defendant did not move for mistrial until after verdict, trial court had duty to make record and rule on any fundamental error regarding whether one juror did not understand English and regarding communications about that subject between court and jury outside defendant's presence).

**9.** *Remmer,* 347 U.S. at 229–30, 74 S.Ct. at 451–52.

**10.** *Id.* at 229, 74 S.Ct. at 451 (any direct or indirect private communication, contact, or tampering with a juror during trial about the matter pending before the court is deemed presumptively prejudicial if not made pursuant to known rules of the court and the instructions and directions of the court during trial, and with the full knowledge of the parties); *State v. Melton,* 102 N.M. 120, 692 P.2d 45 (Ct.App.1984) (while Rule 606(B) effectively precludes defendant from showing the affect on verdict of improper communication to jury, presumption that improper communication amounts to prejudice satisfies the requirements of due process); *cf. Lacy v. Gabriel,* 567 F.Supp. 467, 469

reasonable possibility of prejudice, a new trial should be granted.[11]

*Juror not shown to have answered question dishonestly, nor shown to have been actually or presumptively biased.* On her claim that voir dire was implicated, defendant here received an evidentiary hearing as to whether juror Griego expressly or tacitly misrepresented a material fact. I am satisfied there was substantial evidence to support the finding of the trial court that Griego did not misrepresent a material fact. Even were I to conclude otherwise, the evidence did not show that Griego's answers were dishonest, nor does the mere fact of Griego's prior psychological counselling establish actual or presumptive bias such as would have required his excusal. Consequently, no new trial was required based on misrepresentations during voir dire.

However, because of the showing made, Justice Montgomery posits in his dissent that the issue of bias (unrelated to the voir dire) was before the court on juror Griego's testimony concerning his "special insight" into defendant's character. The court made no finding one way or the other on the question of bias. After finding no misrepresentation of material fact, the trial court noted that defendant had failed to establish actual prejudice flowing from Griego's having been seated as a juror. As discussed above, there was here no issue of prejudice to defendant regardless of whether voir dire was implicated. Taint in the deliberation process was not the question, and no Rule 11–606(B) objection was made; I, therefore, agree with the dissent that the pertinent inquiry at this point was one of bias, not prejudice.

If the judge who presided at trial had not since retired from the bench, it would be appropriate for us to remand for the trial court to decide whether such bias was actually or presumptively present. However, since the judge has retired from the bench, I believe it comports better with justice for

this Court to review the record to determine whether bias actually or presumptively was present. From my review of the record, I am satisfied that it was not.

The evidence reasonably may be read to indicate, as suggested by Justice Montgomery's description in his dissenting opinion, that Griego's testimony revealed deep-seated attitudes about mental illness, and that these attitudes made him an unsuitable juror. I agree that such a finding would require the grant of a new trial. However, as noted by the Seventh Circuit Court of Appeals in a related context:

> Jurors are expected to bring commonly known facts and their experiences to bear in arriving at their verdict. We cannot expunge from jury deliberations the subjective opinions of the jurors, their attitudinal expositions, or their philosophies. These involve the very human elements that constitute one of the strengths of our jury system.

*Shillcut v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1985) (quoting *State v. Poh,* 116 Wis.2d 510, 518, 343 N.W.2d 108, 113 (1984)). It follows that jurors may bring to bear somewhat eccentric beliefs in arriving at their conclusions without those beliefs necessarily amounting to bias that would violate the constitutional right to an impartial jury.

Here, I read the evidence to indicate that Griego took with him to the jury box the store of his past experience and certain religious and attitudinal dispositions; that these characteristics did not amount to bias against the defendant or her insanity defense; that these characteristics nevertheless led Griego to make a preliminary judgment on Pierce's defense theory; and that this judgment was confirmed for Griego by the weight of the evidence. Griego stated that he had known mentally ill persons in the past, and the newspaper reporter testified that Griego had expressed some sympathy for the defendant. Moreover, the

---

(D.Mass.1985) (allegations that juror's unmasking of excluded portion of photographic evidence deprived defendant of the right to confront the evidence against him analyzed in terms of the impact of the evidence on an "aver-

age" or "reasonable" juror, rather than in terms of its actual effect on the jurors involved).

**11.** *State v. Jane Doe,* 101 N.M. 363, 683 P.2d 45 (Ct.App.1983).

reporter testified that Griego's comments showed his familiarity with the evidence presented at trial. Griego explained how he viewed the case thus:

> [T]aking an apple apart, when you see why its wormed—why the apple is wormed, why it is rotting inside. It looks so pretty, and you can take that apart, like we took Darci Pierce apart.

This evidence supports my interpretation that Griego was not biased against the insanity defense, but that, in his judgment, the defense was not proved in this case. I note that no evidence was presented to indicate a belief by Griego that all mentally ill persons were possessed by the devil, or that mentally ill persons always should be held accountable for their actions. For these reasons, I would affirm the decision of the trial court.

MONTGOMERY, Justice (dissenting).

This is a case in which our system for the trial of criminal defendants simply did not work. It is undeniable that one of every citizen's most precious rights, guaranteed by the Bill of Rights in the sixth amendment to the United States Constitution and in article II, section 14, of New Mexico's own Constitution, is the right to trial by an impartial jury in which each and every juror " 'is totally free from any partiality whatsoever.' " *Fuson v. State*, 105 N.M. 632, 633, 735 P.2d 1138, 1139 (1987); *Mares v. State*, 83 N.M. 225, 226, 490 P.2d 667, 668 (1971) (both quoting *State v. McFall*, 67 N.M. 260, 263, 354 P.2d 547, 548–49 (1960)). In this case, although the defendant committed a particularly heinous and atrocious act, she was entitled to be provided with this basic and fundamental right in her trial.

It was particularly important in that trial that none of the jurors have any disqualifying bias on the subject of mental illness. That defendant committed the acts with which she was charged was not in dispute at the trial and is not disputed here. Critically important to her fate is the answer to the question: Under New Mexico law, was the defendant "guilty but mentally ill" or was she "not guilty by reason of insanity"

at the time she committed the acts at issue? Having a jury each member of which had an open mind on this subject was of bedrock importance to this defendant and, indeed, to the fairness with which our system of criminal justice operates in New Mexico. Defendant was denied such a jury in this case, and I would therefore reverse and remand for a new trial.

I.

There is no way in which the system can, with unfailing perfection, provide a pristinely pure jury in each and every case. Juries are made up of imperfect human beings, and their use in the trial of a criminal case is administered by imperfect human beings. The best that can be done is to devise measures to discover those potential jurors who may harbour feelings or attitudes inimical to the defendant and then to administer those measures in a manner calculated to weed out such unsuitable jurors. The principal measure our system has devised to date is the technique of *voir doir* examination: questioning of potential jurors by the trial judge and by counsel to elicit responses that may reveal attitudes and predilections that might otherwise go undetected.

Fundamental to the proper operation of this part of the system is the requirement that each potential juror make a truthful and reasonably complete answer to the questions put to him or her on *voir dire*.

> It is the duty of a juror to make full and truthful answers to such questions as are asked, neither falsely stating any fact *nor concealing any material matter.* If a juror falsely represents his interest or situation *or conceals a material fact* relevant to the controversy and such matters, if truthfully answered, might establish prejudice or work a disqualification of the juror, the party misled or deceived thereby, upon discovering the fact of the juror's incompetency or disqualification after trial, may assert that fact as ground for and obtain a new trial, upon a proper showing of such facts, even though the bias or prejudice is not shown to have caused an unjust

verdict, it being sufficient that a party, through no fault of his own, has been deprived of this constitutional guarantee of a trial of his case before a fair and impartial jury.

*Mares*, 83 N.M. at 227, 490 P.2d at 669 (quoting *Marvins Credit Inc. v. Steward*, 133 A.2d 473 (Mun.Ct.App., D.C., 1957) (emphasis added; court's emphasis omitted)).

In the case before us, when Mr. Griego was asked whether he had ever been treated by a psychiatrist or psychologist, his answer that he could not remember was perhaps true. But his additional statements—that he had had "kind of a dizzy spell," that "they" thought he needed a psychiatrist; and that he didn't have to have a psychiatrist—were simply inadequate to provide even a clue to the revelation that he had been hospitalized for a year for depression manifested by an inability to talk. It is not necessary to ascribe fault to Mr. Griego or to find that he intentionally misrepresented his prior experience with mental illness to hold that the system in this case simply malfunctioned. Whether intentionally or not, Mr. Griego concealed his previous history with a mental disorder. In addition to his testimony at the post-trial hearing, a newspaper reporter and an investigator from the Public Defender's office testified that he had told them he had "gone berserk" and had had a mental illness. If he had given any inkling of these events in his past in response to the trial court's question, the system might have worked as it is intended to: The court or counsel could have explored the subject more fully and elicited facts on which to base a decision whether to challenge for cause or peremptorily.

" 'Full knowledge of all relevant and material matters that might bear upon possible disqualification of a juror is essential to a fair and intelligent exercise of the right of counsel to challenge either for cause or peremptorily.' " *Id.* While I might agree with the opinion of the Chief Justice, which agrees with *Williams v. United States*, 418 F.2d 372, 377 (10th Cir.1969), that the fact that defendant might have lost her right to peremptorily challenge Mr. Griego is not *alone* sufficient to reverse her con-

viction, surely in a case like this, where loss of that right is combined with a showing of actual bias on the part of the juror (to which I shall return below), loss of this important right should be enough to reverse the conviction. As we said in *Fuson*, "prejudice is presumed when the right of peremptory challenge is denied or impaired." 105 N.M. at 634, 735 P.2d at 1140. *See also Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), *overruled on other grounds, Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986): "The denial or impairment of the right is reversible error without a showing of prejudice."

## II.

More serious even than the plurality's inadequate treatment of what caused the system to go wrong in this case—the juror's incomplete and misleading response to the trial judge's question on *voir dire*—is their confusion of the applicable standard for reversal in a case of alleged juror bias and the resulting disregard of the clear and unmistakable actual bias held by the juror and its effect on the defendant.

Quite simply, the plurality have confused the question of whether there was bias on the part of the juror with the quite different question of whether there was prejudice to the defendant as a result of such bias. The opinion of the Chief Justice states that defendant "has not shown how she was actually prejudiced by the juror's sitting on the jury" and finds "no actual prejudice to [defendant] stemming from the juror's answers on *voir dire*." In this respect the plurality make the same error committed by the trial court in finding that the defendant had "failed to establish to the court's satisfaction that actual prejudice has been shown by Mr. Griego's having been seated as a juror."

"Actual prejudice" *to the defendant* need not be demonstrated in a case where actual bias *on the part of the juror* has been shown; in such a case prejudice to the defendant is, or should be, *presumed. See Mares; State v. Sacoman*, 107 N.M. 588,

593, 762 P.2d 250, 255 (1988) ("The fundamental right to an impartial jury is violated when one juror is unqualified for the reason that any verdict would thus be less than the unanimous verdict of twelve.") (citation omitted); *State v. Chavez*, 78 N.M. 446, 432 P.2d 411 (1967); *State v. Sims*, 51 N.M. 467, 188 P.2d 177 (1947) (integrity of the jury is destroyed if one of the jurors serves while concealing bias); *State v. Gallegos*, 88 N.M. 487, 542 P.2d 832 (Ct. App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975) (to allow one unqualified juror to serve would violate state constitutional provisions which secure the right of trial by jury and guarantee an impartial jury); *cf. State v. Coulter*, 98 N.M. 768, 652 P.2d 1219 (Ct.App.1982) (alternate juror's presence in jury room during deliberations creates a presumption of prejudice; since state made no showing to overcome presumption, defendant entitled to new trial). In this case the bias of Mr. Griego, and the ensuing prejudicial impact on the defendant, fairly leap off the pages of the transcript of the post-trial hearing.

First, Mr. Griego revealed deep-seated attitudes on the subject of mental illness, based on his prior experience with it, and a proclivity to arrive at an immediate conclusion about the existence or the non-existence of that condition, and its severity, in the defendant. He was asked when during the course of the trial he arrived at the conclusion that defendant was not insane, to which he replied: "When did I make the conclusion? Since the first day."

Mr. Griego's testimony continued:

Q: And did you tell Mr. Domrzalski [newspaper reporter] that "I have seen people who were ten times worse than she was being in a mental hospital and be cured?"

A: Right.

Q: Did you say that to him?

A: Yes.

\* \* \* \* \* \*

Q: You stated that you have seen people far more crazy than Darci Pierce, far more insane than her, get cured.

A: Yes, I have. Yes, I have. And that has—they have received shock treatments and they were well. They—they

have already gotten over it and died, and I have seen them in my lifetime, yes.

\* \* \* \* \* \*

Q: Okay. Again, calling your attention to your conversation with the *Tribune* reporter on the 29th of March, did you tell him that you had—you personally had electric shock therapy?

A: No, I didn't tell him that. I told him—I told him that I had seen people that had electric shock treatments, and they had gotten well. They were worse, ten times, than Darci Pierce.

In addition, the reporter testified:

A: \* \* \* I had asked, "Do you think she could be cured," meaning can Darci Pierce be cured, and he said, "Yes. I have seen people ten times worse than her get into the hospital and be cured." And then he volunteered, said something like, "I was mentally sick" \* \* \*

A: \* \* \* I asked him—this is not on the notes, but I asked him when, how, all that stuff, and he said, "12, or 13 or 14. I had to go into a hospital for a year. That's why it was so easy to judge her case."

\* \* \* \* \* \*

Q: He did state to you, though, that because he was in the hospital, that that is why it was so easy for him to judge her case?

A: Because he had been mentally sick.

In addition to this juror's attitudes on the subject of mental illness, he displayed a willingness to translate those feelings into a premature judgment about defendant's guilt. While it is true that he answered in the affirmative when asked whether he made his decision based on the facts that he heard in evidence in the case, immediately preceding that answer he was asked when he had made up his mind about defendant's guilt or innocence. He answered: "I think I made my mind up about the first—second or first day, because I really looked into the case right there and I said to myself, that person is—I mean, is guilty of murder." Add to these statements the testimony quoted in the Chief Justice's opinion to the effect that he could see the devil in defendant, saw in her "right away" witchcraft, "saw in her murder," and a

**610**

clearer case of bias on the part of a juror and resulting prejudicial impact on a defendant can scarcely be imagined.

We have long held that a juror's statement regarding his impartiality is not conclusive. *Mares,* 83 N.M. at 226, 490 P.2d at 668. Since it is not conclusive, an avowal of impartiality is not sufficient to protect the constitutional right to an impartial jury. *Alvarez v. State,* 92 N.M. 44, 46–47, 582 P.2d 816, 818–19 (1978). And, of course, a juror is required to refrain from coming to any decision on the merits of a case until he or she has heard all of the evidence and the case has been submitted. *See* SCRA 1986, 14–101.

For the proposition that a party seeking a new trial because of non-disclosure by a juror during *voir dire* must show actual bias, the opinion of the Chief Justice relies on *Baca v. Sullivan,* 821 F.2d 1480 (10th Cir.1987), which in turn relied on *United States v. Perkins,* 748 F.2d 1519 (11th Cir. 1984). However, *Perkins* also said that "[a]ctual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.' " 748 F.2d at 1532 (quoting *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976)).

In this case there is no need to presume bias; its existence was manifested unequivocally in the juror's own testimony. That being the case, there was no occasion for defendant to go further and attempt to prove actual prejudice to herself; prejudice is presumed and, moreover, was amply demonstrated by the juror's testimony at the hearing.

The trial court's decision denying defendant's motion for new trial should therefore be reversed and the cause remanded for a new trial, at which, hopefully, the system will function as it is intended to function.

WILSON, J., concurs.