192 P.3d 12 (2008)
YAKIMA COUNTY, a political Subdivision of the State of Washington, Respondent,
v.
EASTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, an agency of the State of Washington, Respondent, and
Wenas Citizens Association and Brent Brune, Appellants,
Jim and Charlotte Caton, Respondents.
No. 26783-1-III.
Court of Appeals of Washington, Division 3.
September 11, 2008.
*14 David Scott Mann, Gendler & Mann LLP, Seattle, WA, for Appellant.
James Cortland Carmody, Velikanje Halverson PC, Terry Dee Austin, Attorney at Law, Paul Edward McIlrath, Yakima, WA, Martha Patricia Lantz, Office of Atty. Gen. Lic. & Admin. Law Div., Olympia, WA, for Respondents.
KULIK, A.C.J.
¶ 1 In 2002, Yakima County (County) approved Jim and Charlotte Caton's request for redesignation of 1,086 acres of land from agricultural resource to rural self-sufficient. The Wenas Citizens Association (WCA) appealed the redesignation to the Eastern Washington Growth Management Hearings Board (Board), and the Board reversed. The Catons and the County appealed to superior court which reversed in favor of the Catons and the County. WCA appealed to this court, and we remanded to the Board for further review. The Board again denied the Catons' redesignation. This matter now comes before us for the second time.
¶ 2 The Board must find compliance with the Growth Management Act (GMA), chapter 36.70A RCW, unless it determines that the County's action was clearly erroneous. We conclude that the Board erred by reversing the County's decision to redesignate the Caton property from agricultural resource to rural self-sufficient. We also conclude that the County satisfied the criteria set forth in Yakima County Code (YCC) 16B.10.040(1)(e). Accordingly, we reverse the Board's order and affirm the County's redesignation of the Caton property from agricultural resource to rural self-sufficient, and rezone from agriculture to valley rural.

FACTS
¶ 3 The Catons own 1,770 acres of property near the town of Naches, Washington, in Yakima County. The property is on a ridge that separates the Naches and Wenas valleys. The dispute here concerns a 2002 amendment to Yakima's Comprehensive Plan and redesignation of 1,086 acres of the Caton property.
¶ 4 In 1997, the County adopted a GMA plan known as Plan 2015. Plan 2015 designated the Caton property as "agricultural resource" land  "`agricultural land' [of] long-term commercial significance" under RCW 36.70A.030(2). The Catons did not appeal this designation. The properties adjacent to the Caton property were also designated *15 "agricultural resource" by Plan 2015 and zoned "agriculture." 2002 AR at 276.[1]
¶ 5 In 2001, the Catons applied for an amendment to Plan 2015. Initially, the Catons sought to change 1,770 acres from agricultural resource to rural self-sufficient, including both steep slopes and flat land. At the suggestion of the Yakima County Planning Commission's staff, the Catons later modified their application to include only the flat ridge-top lands, a total of 1,086 acres. The rural self-sufficient designation allows 5-acre minimum parcel size.
¶ 6 The Yakima County Planning Commission's staff recommended that the initial application for redesignation be denied. After the application was amended to exclude the steep slopes, the Yakima County Planning Commission and the Board of Commissioners approved the application and changed 1,086 acres from agricultural resource to rural self-sufficient. WCA appealed the redesignation to the Board, which reversed the County's decision. The Board's final decision and order found that the County's actions were clearly erroneous and out of compliance with the GMA.
¶ 7 The Catons and the County appealed the Board's decision to Yakima County Superior Court. The superior court reversed the Board and reinstated the County's decision. WCA appealed to this court. We remanded to the Board for proper application of the burden of proof, the standard of review, and the statutory definition of agricultural lands.
¶ 8 On remand from this court, the Board concluded that the acts of the County were clearly erroneous because the property met the statutory definition of agricultural land. The Board also determined that the County failed to follow its own criteria for amending Plan 2015. The Board remanded the case to the County to take appropriate action to comply with the GMA.
¶ 9 The Catons and the County again appealed the Board's decision to Yakima County Superior Court, which again reversed the Board. WCA then sought direct review to the Supreme Court. The Supreme Court transferred the case to this court.
¶ 10 Standard of Review. Growth management hearings boards are charged with adjudicating GMA compliance and, when required, invalidating noncompliant plans and regulations. RCW 36.70A.280. Significantly, these boards must find compliance unless they determine a county action is "clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). An action is "clearly erroneous," if the board has a "`firm and definite conviction that a mistake has been committed.'" Lewis County v. W. Wash. Growth Mgmt. Hearings Bd., 157 Wash.2d 488, 497, 139 P.3d 1096 (2006) (quoting Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wash.2d 179, 201, 849 P.2d 646 (1993)).
¶ 11 The appeal of a board action is governed by the Administrative Procedure Act (APA), chapter 34.05 RCW. Under the APA, the "burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). The Catons and the County challenge the Board's order on remand based on RCW 34.05.570(3)(d) and (e). Specifically, they contend that the Board's order was an erroneous interpretation and application of law under subsection (d), and that the order was not supported by substantial evidence under subsection (e).
¶ 12 We review issues of law de novo. Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 8, 57 P.3d 1156 (2002). Allegations under RCW 34.05.570(e) are mixed questions of law and fact; this court examines the law independently, then applies the facts to the law as found by the agency. Lewis County, 157 Wash.2d at 498, 139 P.3d 1096 (quoting Thurston County, 148 Wash.2d at 8, 57 P.3d 1156). Challenges to the evidence supporting the agency's order are reviewed for substantial evidence. Substantial evidence exists when a sufficient quantity of evidence exists to persuade a fair-minded *16 person of the truth or correctness of the agency's order. Thurston County, 148 Wash.2d at 8, 57 P.3d 1156 (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998)).
¶ 13 The parties disagree over the amount of deference owed to the County's decision to redesignate the Caton property. In Quadrant Corporation v. Central Puget Sound Growth Management Hearings Board, the Washington Supreme Court granted deference to the agency's interpretation of the law in cases where the agency had a specialized expertise in the subject area, but also determined that the courts were not bound by the agency's interpretation of a statute. Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 233, 110 P.3d 1132 (2005) (quoting City of Redmond, 136 Wash.2d at 46, 959 P.2d 1091).
¶ 14 Specifically, in Quadrant, the Supreme Court held that "deference to county planning actions, that are consistent with the goals and requirements of the GMA, supersedes deference granted by the APA and courts to administrative bodies in general." Quadrant, 154 Wash.2d at 238, 110 P.3d 1132. The court also held that while "this deference ends when it is shown that a county's actions are in fact a `clearly erroneous' application of the GMA, we should give effect to the legislature's explicitly stated intent to grant deference to county planning decisions." Id.
¶ 15 The Catons and the County argue that the Board failed to grant deference to the actions of the County. They assert that this case involves a factual dispute, and not the interpretation of the GMA. In contrast, WCA argues that the Catons' and the County's position requires that the Board grant unbridled deference to the actions of the County.
¶ 16 Here, the Board must find the County's action in compliance unless it determines the action is "clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). The question for this court is whether the Board erred by concluding that the actions of the County were clearly erroneous.
¶ 17 Agricultural Land of Long-Term Commercial Significance. The GMA provides guidelines for the classification, designation, and regulation of resource lands. RCW 36.70A.050, .060, .170. Resource lands are also referred to as natural resource lands and include agricultural lands, forest lands, mineral resource lands, and critical areas. RCW 36.70A.050(1). "`Natural resource lands are protected not for the sake of their ecological role but to ensure the viability of the resource-based industries that depend on them. Allowing conversion of resource lands to other uses or allowing incompatible uses nearby impairs the viability of the resource industry.'" City of Redmond, 136 Wash.2d at 47, 959 P.2d 1091 (quoting Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L.REV. 867, 907 (1993)).
¶ 18 The legislature has been particularly concerned with agricultural lands when addressing the problem of growth management. City of Redmond, 136 Wash.2d at 47, 959 P.2d 1091. Read together, RCW 36.70A.020(8), .060(1), and .170, reveal a legislative mandate for the conservation of agricultural land. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 562, 14 P.3d 133 (2000).
¶ 19 In 2002, the County changed the designation of 1,086 acres of the Caton property from agricultural resource to rural self-sufficient. To determine whether the redesignation of the Caton property was clearly erroneous, we must examine whether the property meets the GMA definition of "agricultural land."
¶ 20 RCW 36.70A.030(2) defines "agricultural land" as
land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, ... or livestock, and that has long-term commercial significance for agricultural production.

*17 (Emphasis added.) "Long-term commercial significance" encompasses "the growing capacity... of the land for long-term commercial production, in consideration with the land's proximity to population areas, and the possibility of more intense uses of the land." RCW 36.70A.030(10).
¶ 21 In Lewis County, the Supreme Court summarized the definition of "agricultural land" as follows:
[A]gricultural land is land: (a) not already characterized by urban growth (b) that is primarily devoted to the commercial production of agricultural products enumerated in RCW 36.70A.030(2), including land in areas used or capable of being used for production based on land characteristics, and (c) that has long-term commercial significance for agricultural production, as indicated by soil, growing capacity, productivity, and whether it is near population areas or vulnerable to more intense uses. We further hold that counties may consider the development-related factors enumerated in WAC 365-190-050(1) in determining which lands have long-term commercial significance.
Lewis County, 157 Wash.2d at 502, 139 P.3d 1096.
¶ 22 Regarding the first factor, the Board found that the Caton property is located outside an urban growth area. Evidence showed that the Caton property was on an isolated ridge separating the Naches and Wenas valleys. Adjacent properties to the north, south, east, and west are designated agricultural resource and zoned agricultural. Here, substantial evidence supports the Board's finding that the Caton property is located outside an urban growth area.
¶ 23 Lewis County next considers whether the land is "primarily devoted to the commercial production of agricultural products enumerated in RCW 36.70A.030(2), including land in areas used or capable of being used for production based on land characteristics." Lewis County, 157 Wash.2d at 502, 139 P.3d 1096. The products included in RCW 36.70A.030(2) are "horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed,... or livestock." Neither current use nor landowner intent conclusively satisfies this factor. City of Redmond, 136 Wash.2d at 53, 959 P.2d 1091. Moreover, the fact that the land is "physically suited to farming" does not mean that it "has the enduring commercial quality needed to fit the agricultural land definition." Lewis County, 157 Wash.2d at 501, 139 P.3d 1096.
¶ 24 The Catons contend their property was not used for agricultural production. They point out that the property has steep slopes and is not in an irrigation district. The Catons also maintain that there are no dryland farming operations in the area and that the capacity of their property for commercial farming operations is limited. These limitations were explained by the former owner, George E. Johnson, and several other local dryland farmers. The Yakima County Planning Staff confirmed the farmers' statements explaining that the agricultural resource designation was not consistent with the property.
¶ 25 The Catons and the County challenge the Board's finding that the Caton property "has soils that have a high available water capacity and the effective rooting depth is 60 inches or more, which is ideal for agricultural production." 2005 AR at 212.
¶ 26 The Board's finding is only arguably supported by the United States Department of Agriculture (USDA) Soil Conservation Service Survey (Soil Survey). The Caton property contains several soils, including Cowiche loam, 8 to 15 percent slopes, and Cowiche loam, 15 to 30 percent slopes. The Soil Survey describes Cowiche loam, 8 to 15 percent slopes, as: "Permeability of this Cowiche soil is moderate. Available water capacity is high. Effective rooting depth is 60 inches or more." Clerk's Papers (CP) at 181. The Soil Survey also describes the same for Cowiche loam, 15 to 30 percent slopes. However, the land-capability classification system in the Soil Survey shows that even the best soils on the Caton property have severe or very severe limitations for agricultural production and some other soils are unsuitable for agriculture. The Caton property has no irrigation water.
*18 ¶ 27 The Board found that the property was being used commercially for grazing cattle and that it has been used historically for this activity. The Board also found that: "The property has been planted in natural vegetation and the Catons were paid annually for eleven years by the U.S.D.A. under the CRP[2] program." 2005 AR at 212.
¶ 28 The Catons and the County assert that the property had not been cropped for 18 years prior to the time of the 2001 application. The Catons challenge the Board's reliance on their participation in the CRP. They point out that during their enrollment in the CRP program, they were contractually prohibited from farming their property.
¶ 29 The CRP is administered by the USDA Farm Service Agency (FSA). To be eligible for the program, the land must be planted or considered planted in an agricultural commodity two of the last five most recent crop years or contain pastureland that has certain acreage in the Water Bank Program or is suitable for use as a riparian buffer to be planted with trees.
¶ 30 In his declaration, Brian Miller, County Executive Director for the FSA, stated that: "The purpose and focus of the CRP was on environmental enhancement and protection of soil." 2002 AR at 741. Mr. Miller explained that after the Caton property was enrolled in the CRP, the property was not farmed and the Catons planted crested wheat grass for erosion control. The goal of this project was soil protection. According to Mr. Miller, the maximum compensable payment for the Caton property was $41.77 per acre. He stated that: "Payments are intended to approximate the returns from farming." 2002 AR at 741. Thus, enrollment in the CRP program does not necessarily support the Board's finding that enrollment in the CRP program is an agricultural use.
¶ 31 The inquiry here is whether the Caton property was devoted primarily to agricultural uses. The County relied on testimony and evidence that the land was not suitable for agricultural production. There are no dryland framing operations in the area, the property is not within an irrigation district, the property does not have irrigation water, and precipitation is inadequate. The Board erred by concluding that the Caton property is primarily devoted to commercial production of agricultural products.
¶ 32 The third factor governing the designation of land as agricultural resource requires that the property has "long-term commercial significance for agricultural production, as indicated by soil, growing capacity, productivity, and whether it is near population areas or vulnerable to more intense uses." Lewis County, 157 Wash.2d at 502, 139 P.3d 1096 (emphasis added). The Board concluded that the Caton property came within the definition of agricultural lands of long-term commercial significance.
¶ 33 The Department of Community, Trade and Economic Development established guidelines for classifying "agricultural lands of long-term significance for the production of food or other agricultural products." WAC 365-190-050(1). Specifically, WAC 365-190-050 requires that counties and cities use the land-capability classification system of the Soil Conservation Service. The land-capability classification system sets forth classes of soil that are incorporated into "map units" in published soil surveys. These classes of soil consider soil composition of the land, growing capacity, and productivity.
¶ 34 Soils. The County evaluated the soil characteristics of the Caton property based on the Soil Survey of the County. The Caton property contains soils from several different detailed soil map units. The mapped composition of the soils on the Caton property is:

Map Unit Description
 26 Cowiche loam, 8-15% slopes
 27 Cowiche loam, 15-30% slopes
 41 Gorskel very stony loam, 0-25% slopes
 42 Gorskel-Harwood complex, 0-25% slopes
 70 Logy cobbly silt loam, 0-5% slopes
 Renslow silt loam,
 basalt substratum, 5-15% slopes
164 Torriorthents, steep

Br. of Resp't Caton at 25.
¶ 35 Under the land-capability classification system, the predominant soils on the Caton property, soil map units 26 and 27, are classified as class III and class IV. Class III *19 soils have "severe limitations that reduce the choice of plants or that require special conservation practices, or both." Soil Survey, p. 146, Attach., Br. of Resp't Caton. Class IV soils have "very severe limitations that reduce the choice of plants or that require very careful management, or both." Soil Survey, p. 146, Attach., Br. of Resp't Caton. Other soils on the Caton property, the gorskel very stony loam, gorskel-harwood complex, and the torriorthents, steep, are class VII; the logy cobbly silt loam is class VI and the renslow silt loam is class IIIe. Subclass "e" means that the main risk is erosion unless close-growing plant cover is maintained. Class VI soils have "severe limitations that make them generally unsuitable for cultivation." Soil Survey, p. 146, Attach., Br. of Resp't Caton. Class VII soils have "very severe limitations that make them unsuitable for cultivation." Soil Survey, p. 146, Attach., Br. of Resp't Caton.
¶ 36 Most of the soils on the Caton property are Cowiche loam, with 8 to 15 percent and 15 to 30 percent slopes, and no irrigation is available. The Soil Survey describes both types of soils as follows:
The main limitations for nonirrigated crops are low annual precipitation and the hazard of water erosion. Because precipitation is not sufficient for annual cropping, a cropping system that includes winter wheat and summer fallow is most suitable.
CP at 181-82. While the nonirrigated Cowiche loam found on the Caton property, classified as map units 26 and 27, has slopes of 8 to 15 percent and 15 to 30 percent, the same soil  if irrigated and found at 2 to 5 percent  would be classified as prime farmland.
¶ 37 The Board found that "[t]here are no `prime' farmland soils on the site, as defined and established by the land-capability classification system of the USDA Soil Conservation Service." 2005 AR at 213. But the Board also found that: "The property has excellent soils for dry land farming, including Cowiche loam, considered `prime' when irrigated and located on land with slopes of 0-5%." 2005 AR at 212.
¶ 38 The Board's findings illustrate the Board's belief that the Cowiche loam on the Caton property is prime soil, with more slope and no irrigation. This assumption is invalid because the Cowiche loam on the Caton property is not irrigated and has more slope. Simply stated, soil units 26 and 27, Cowiche loam with steep slopes, are not prime farmland and are not suited to commercial crop production.
¶ 39 Growing Capacity. With regard to growing capacity, the Board found that the property (1) had soils in the top 30 percent of county-wide rangeland production during favorable and normal precipitation years, and within the top 19 percent during unfavorable precipitation years; and (2) had soils that have a high available water capacity.
¶ 40 The Board referred to the testimony of Wes Hazen, who presented evidence related to rangeland production values. Forty-eight percent of Yakima County is rangeland. In rangeland areas, cow, calf, and steer operations are dominant.
¶ 41 According to the Soil Survey's discussion of rangeland: "Total production is the amount of vegetation that can be expected to grow annually on well managed rangeland that is supporting the potential natural plant community." Soil Survey, p. 146, Attach., Br. of Resp't Caton.
¶ 42 Mr. Hazen relied on Table 6 to explain the ability of the Caton property to produce natural vegetation. Table 6 shows "the total annual production of vegetation in favorable, normal, and unfavorable years." Soil Survey, p. 146, Attach., Br. of Resp't Caton. But rangeland total production figures are not limited to crops. In Table 6, the total production figures "includes all vegetation, whether or not it is palatable to grazing animals" and "the current year's growth of leaves, twigs, and fruits of woody plants." Soil Survey, p. 146, Attach., Br. of Resp't Caton. In contrast, Table 5 of the Soil Survey contains information pertaining to yields per acre of crops and pasture for nonirrigated land.
¶ 43 The Board's use of rangeland figures is unpersuasive. The rangeland figures arise from property where cows, calves, and steers predominate. The rangeland figures are not limited to edible vegetation.
*20 ¶ 44 The Board found that the Caton property "is currently being used commercially for grazing cattle." 2005 AR at 212. But there is no finding showing the profit made or the numbers of cows grazed per acre. The Board refers to the CRP program but does not explain that the compensation was only $41.77 per acre. The Board found that while the property has no water rights, a well driller testified that the aquifer "`is substantial, for any amount of homes that the Catons or anyone else want to build.'" 2005 AR at 213. The Board also found that the soils have a high available water capacity. However, the fact that the soils have a high available water capacity is not particularly helpful when the property has no water rights.
¶ 45 The Board also found that the Caton property "is farmable for grass hay and winter wheat with summer fallow." 2005 AR at 212. Table 5 of the Soil Survey indicates the average yield per acre for various soil types. According to this table, soils contained in map units 26 and 27 are not suitable for the production of alfalfa hay, corn, asparagus, distillate mint, or apples. The table shows that these soils are suitable for winter wheat. Yields are expected to be 35 bushels per acre for nonirrigated soils. Consequently, there is no support for the Board's finding that the property is suitable for grass hay production.
¶ 46 The evidence on growing capacity is, at best, mixed and does not establish that the actions of the County were clearly erroneous.
¶ 47 Productivity. The Board found evidence that the Caton property:
(1) has been historically dry land wheat farmed by the Catons.... The record shows an average of 36 bushels per acre per year, one bushel higher than the U.S.D.A. soil survey average[;] (2) has historically been used to graze cattle for market (no profit/expense statement available in the record or number of animal units per acre grazed on the property) [and] (3)... has been planted in natural vegetation and the Catons paid annually for eleven years by the U.S.D.A. under the CRP program.
2005 AR at 222 (italics added). The evidence regarding productivity is mixed. There are no figures demonstrating the productivity of the cattle operations. The County disagrees with the 36 bushels per acre per year figure. The evidence suggests that such yields are not sufficient to sustain a farming operation.
¶ 48 In summary, the Board has failed to show that the County erred by determining that the Caton property was not agricultural land of long-term commercial significance. There is little evidence that the property is commercially productive farmland. The County's redesignation was not clearly erroneous in view of the entire record before the Board and in light of the goals and requirements of the GMA.
¶ 49 Criteria for Amendment. The Board also concluded that the County did not meet its own criteria for amending its comprehensive plan. YCC 16B.10.040(1)(e) provides:
To change a resource designation, the plan map amendment must do one of the following[:]
(i) Respond to a substantial change in conditions beyond the property owner's control applicable to the area within which the subject property lies; or
(ii) Better implement applicable comprehensive plan policies than the current map designation; or
(iii) Correct an obvious mapping error; or
(iv) Address an identified deficiency in the plan.
¶ 50 The County approved the redesignation of the Caton property based on the recommendation of the Planning Commission. The Planning Commission considered the County's change of designation criteria and concluded that the redesignation of the Caton property (1) was supported by a change in conditions or circumstances pertaining to the property, (2) better implemented the comprehensive plan policies than the current map designation, and (3) was appropriate to correct a prior mapping error. The Board ultimately determined that the redesignation of the Caton property did not fit any of the redesignation criteria contained in YCC 16B.10.040(1). We disagree.
*21 ¶ 51 The County did not err by determining that the redesignation better implements the comprehensive plan. Plan 2015 describes the purpose of rural self-sufficient land use as follows:
The intent of the Rural Self-Sufficient land use category is to implement Growth Management Act Planning Goals related to reducing sprawl, protecting the environment and providing adequate facilities and services commensurate with the density of development. The Rural Self-Sufficient category provides a broad choice of areas within rural Yakima County where an independent and private lifestyle can be sustained on acreage homesites.
2002 AR at 354.
¶ 52 The rural self-sufficient designation specifies a 5-acre minimum parcel size and imposes restrictions designed to reduce sprawl and protect the environment. Rural self-sufficient lands are usually found "on lowland foothills, ridges, terraces and valley floor areas," and are generally contiguous or interspersed among lands designated for long-term commercial farm or forest use. 2002 AR at 354. These lands are "typified by sage, cheat grass and other dryland vegetation." 2002 AR at 354.
¶ 53 The Catons and the County argue convincingly that the Caton property fulfilled all of the rural self-sufficient mapping standards and does not meet the mapping standards of agricultural resource. The County's determination relied on a variety of factors, including a lack of irrigation water, the short growing season, the absence of prime farmland soil, and the lack of history of viable commercial farming. Additionally, the evidence shows that the property did not meet mapping criteria for agricultural resource lands. We conclude that the County was not clearly erroneous in determining that the rural self-sufficient designation better implements the comprehensive plan.
¶ 54 Because we conclude that the County met one of its criteria for redesignation, we need not address the remaining criteria.
¶ 55 Issues Raised for the First Time on Appeal. The Catons claim the WCA improperly raised an issue for the first time on appeal. Specifically, the Catons point to WCA's issue statement challenging the County's failure to make specific findings of fact supporting its decision to redesignate agricultural resource lands to rural self-sufficient. WCA does not provide any argument related to this issue. If a party raises an issue but fails to provide argument relating to the issue in his or her brief, the party waives any challenge to the alleged issue. See Fosbre v. State, 70 Wash.2d 578, 583, 424 P.2d 901 (1967).
¶ 56 Conclusion. We reverse the Board's order that the County erroneously redesignated the Caton property and that the County failed to meet the criteria of YCC 16B.10.040 for redesignation.
¶ 57 We affirm the County's action redesignating the Caton property from agricultural resource to rural self-sufficient and rezoning from agriculture to valley rural.
WE CONCUR: BROWN and KORSMO, JJ.
NOTES
[1] The administrative record for case XX-X-XXXXX-X consists of documents numbered 1 through 768 and is referred to as "2002 AR." The administrative record for case XX-X-XXXXX-X consists of documents numbered 1 through 240 and is referred to as "2005 AR."
[2] Conservation Reserve Program.