# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**NO. 30,120**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**

**HAROLD ULIBARRI,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**James A. Hall, District Judge**

Hugh W.  Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**SERNA, Justice.**

{1}    Pursuant to Rule 12-102(A)(1) NMRA, Harold Ulibarri (Defendant) is before this Court on direct appeal from his convictions for first degree murder and tampering with evidence contrary to NMSA 1978, Sections 30-2-1(A)(1) (1963, as amended through 1994) and 30-22-5(A) (1963, as amended through 2003), respectively. He argues that the evidence presented at trial was insufficient to support his convictions. He also argues that he was denied his constitutional right to a fair and impartial jury when the district court refused to grant him a new trial on the following grounds: the district court's failure to produce one of the jurors for questioning after he allegedly made an improper statement, alleged omissions and misrepresentations made by some of the jurors on the jury questionnaires, and the jury having supposedly discussed extraneous and prejudicial information during deliberations. Defendant's contentions are without merit and we therefore affirm his convictions and the denial of his motion for a new trial.

**I.    BACKGROUND**

{2}    On October 30, 2005, Rhonda Gutierrez (Victim) was shot multiple times in her home and died from her wounds. In connection with Victim's death, Defendant was tried for first degree murder, tampering with evidence, and breaking and entering. The State's theory of the case was that Defendant killed Victim, his girlfriend of thirteen years and the mother of his two children, because he was angry that she was

2

leaving him for another man. The district court granted Defendant a directed verdict on the breaking and entering charge and the jury found him guilty of first degree murder and tampering with evidence.

**A.      Factual Background**

{3}      Prior to Victim's death, she and Defendant had an approximately thirteen-year relationship. They had two children. The family lived together in a mobile home in Chama, with Victim's grandparents, Jose and Antonia Gutierrez ("Grandfather" and "Grandmother"). The relationship between Defendant and Victim was "off and on" and, during the thirteen years, they separated and subsequently reconciled numerous times.

{4}      In May of 2005, Victim met Kenny Duran and they began to have a relationship, though they kept it a secret. A few months after meeting Duran, Victim asked Defendant to move out of the trailer. There is contradictory testimony as to whether Defendant complied or remained living in the trailer. In the subsequent months, Defendant made several attempts at reconciling with Victim, but she rejected him. Defendant eventually learned of Victim's relationship with Duran.

{5}      On October 29, 2005, Duran picked Victim up from her home at about ten o'clock so that they could go to a Halloween dance at a bar. When they were driving away from Victim's home, Duran noticed a truck that looked like Defendant's parked down the street with its parking lights on. After they had driven several blocks away, Victim asked Duran to drive back to her home so that she could make sure she had

locked the door. When they returned to Victim's home, they saw what appeared to be Defendant's truck parked in the driveway. Victim told Duran not to stop and to just keep on driving. Both cars began to drive in the same direction on a parallel road until they reached the main road, at which time Duran confirmed that it was Defendant in the other truck. At that point, Defendant turned south; Duran turned north to avoid a potential altercation. Victim was very upset. She called Defendant and angrily asked him what he was doing at her home and told him that she did not want him there. Duran and Victim continued to the bar.

{6}     An employee of the liquor store attached to the bar where the couple went testified that a truck that was consistent with Defendant's parked across the street from the bar where the driver "could see through the whole [bar]."

{7}     At Victim's home at about 2:00 a.m. that same morning, Grandmother awoke because the trailer was very cold. She saw that the window in the children's bedroom had been removed. She went into the living room and found Defendant sitting there with the lights off. Grandmother asked Defendant to replace the window. Defendant replaced the window and then returned to the living room. Grandmother went back to sleep and did not know what Defendant did at that point or when he left.

{8}     After they spent the night in a hotel together, Duran drove Victim home at about 7:00 a.m. the following morning. It was important that she arrive by 7:00 a.m. because Defendant was supposed to return the children to her at that hour; he had plans to go to Colorado that morning. However, when Victim arrived at home, the

4

children had not been dropped off, so she went directly to her room to lie down. Grandmother had two brief conversations with Victim and then left to go to church at about 7:55 a.m.

{9} Grandfather remained at home and watched a church program on television. He was hard of hearing and had the volume turned up very loudly. During the program, Defendant appeared without the children. He entered the kitchen and sat down with or behind Grandfather for a few minutes. Grandfather testified that this was unusual because Defendant was typically not friendly with him and "never even talked" to him. After a few minutes, Grandfather saw Defendant go outside and drive away quickly in his truck. At about 8:30 a.m., a neighbor saw Defendant's truck traveling "pretty fast" on a nearby road.

{10} Defendant then returned to the home and asked Grandfather to call Victim from her room, explaining that he was afraid that she would be angry with him if he tried to call her himself.

{11} Grandfather went into Victim's room and saw her lying on the floor. Grandfather put his hand over her heart and head and observed that she was cold. Defendant wrapped Victim in a blanket, carried her to his truck, and drove her to a medical clinic in Tierra Amarilla.

{12} The same neighbor that had earlier observed Defendant's truck traveling fast once again saw Defendant driving his truck, but at a slower speed than what he had previously observed.

{13}     An emergency medical technician met Defendant and Victim at the clinic. She testified that she thought it was strange that Defendant had parked his truck at a distance from the clinic's emergency doors. She had to ask him to move the truck closer so that they could transport Victim into the clinic more easily. She could not get a pulse from Victim. Suspecting that a possible assault had occurred, the technician called for law enforcement and the Office of the Medical Investigator.

{14}     Various police officers responded, several of whom happened to be life-long friends of Defendant. One of these friends, Officer Luis Martinez, delivered the news to Defendant that Victim had died. At that time, there was little information about what had happened to Victim; there had been no autopsy and the medical professionals' first observations led them to believe that Victim had been stabbed. However, Officer Martinez witnessed a bullet fall from Victim's body. He then approached Defendant, who was seated in Officer Martinez's police vehicle and asked, "what's going on; she is shot?" Defendant responded, "I know. I thought you said she was cut." Defendant made several other strange remarks to his law enforcement friends, including, "[y]eah, I've been hunting, too, but it looks like I'm going to be fucked now" and, when asked how long he had until retirement, "[n]ow probably never."

{15}     The autopsy revealed that Victim died of multiple gunshot wounds. She was shot three times—once in the head from close range, once in the shoulder, and once in the cheek. Blood splatter stains were found in Victim's bedroom. 0.22 caliber

6

bullets were recovered from Victim's body and unfired 0.22 caliber cartridges were found both in Defendant's truck and near the window that was found open at Victim's home the previous evening. An empty Colt 0.45 revolver holster was found in Defendant's truck. The gun used to kill Victim was never found.

{16} The police conducted a gunshot residue test on Defendant and the results came back negative, indicating no gunshot residue on Defendant's hands. The police stated, however, that Defendant had washed his hands while he was at the clinic, which could have affected the results.

{17} Defendant claimed that at the time Victim was killed, he was purchasing fuel and tobacco at a local gasoline station and convenience store. However, three store clerks who were working at the gas station and convenience store that morning all testified that Defendant did not come into the store at any time during that morning. Additionally, Defendant testified that at around the time he was observed to be following Victim and Duran, he had been scouting for elk. However, Officer Martinez, also an experienced hunter, testified that it is not customary to scout for elk late at night; hunters scout for elk in the early morning, or in the late afternoon and evening.

{18} While in jail after his arrest, Defendant made several phone calls attempting to persuade witnesses to change their statements. During one of the calls, Defendant denied making the incriminating statement to Officer Tommy Martinez to the effect that he was "going to be fucked now" and urged someone to contact the officer and

7

tell him to say that Defendant did not make that statement. Defendant also made a call to someone and urged them to contact Grandmother and tell her that he was not at Victim's trailer at 2:00 a.m., but rather that he was there at 8:00 a.m. to fix the window.

**B.     Proceedings Below**

**{19}**     Defendant was charged with first degree murder, breaking and entering, and tampering with evidence and a six-day trial ensued. Near the end of the trial, the district court alerted the parties that Juror Bill Martinez (Juror) had allegedly said in front of other jurors that it was an "open and shut" case and that "there was no evidence presented otherwise." Defense counsel initially took no position, then requested that Juror be questioned regarding the statement he made in the jury room, and finally requested that he "be excluded from deliberations and designated as an alternate." The district court accordingly designated Juror as an alternate over the State's objection. The jury found Defendant guilty of first degree murder and tampering with evidence.

**{20}**     Through a post-trial investigation, Defendant discovered both that some jurors had failed to disclose certain information on their juror questionnaires and that, during deliberations, some jurors discussed an Española murder case in which a mistrial was declared because the jurors could not reach unanimity. Claiming that his constitutional right to a fair and impartial jury was violated, Defendant moved for a new trial based on the district court's refusal to produce Juror for questioning, the

omissions on the juror questionnaires, and the discussions of the Española mistrial during deliberations. Defendant submitted affidavits of his trial counsel and an investigator in support of the motion. After a hearing, the district court denied the motion.

## II. DISCUSSION

### A. Sufficiency of the Evidence

{21} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). In applying this standard, an appellate court "review[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict," *State v. Rudolfo*, 2008-NMSC-036, ¶ 13, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted), and after reviewing the evidence as such, "[t]he relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). The reviewing court does not substitute its judgment for that of the jury: "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the] [d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Nor does this

9

Court "evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted).

### 1. First Degree Murder

{22} Defendant asserts on appeal that there was insufficient evidence for a rational jury to find that Defendant committed first degree murder beyond a reasonable doubt because the State failed to prove deliberate intent. In New Mexico, first degree murder includes "any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). Deliberate intention is a decision "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA. "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (internal quotation marks and citation omitted).

{23} Although Defendant emphasizes that the State did not proffer any "direct, physical or biological evidence" from which a reasonable jury could convict him of first degree murder, he also acknowledges that such evidence is not required and that circumstantial evidence is sufficient to uphold a first degree murder conviction. *See State v. Motes*, 118 N.M. 727, 729, 885 P.2d 648, 650 (1994); *State v. Duran*, 107 N.M. 603, 605, 762 P.2d 890, 892 (1988) ("Just because the evidence supporting the conviction was circumstantial does not mean it was not substantial evidence."),

10

*superseded on other grounds by rule*, Rule 11-801(D)(1)(a) NMRA (as amended through 1995), *as recognized in State v. Gutierrez*, 1998-NMCA-172, ¶ 10, 126 N.M. 366, 969 P.2d 970. The crux of Defendant's argument, then, is that the State's evidence was both circumstantial and tenuous and that it, "without more, [was] not substantial evidence to support a deliberate intent to kill." We disagree.

{24} Viewing the evidence in the light most favorable to the verdict, there is substantial evidence to support the jury's conclusion that Defendant killed Victim with the deliberate intent to do so. The State presented evidence that Defendant was upset that Victim had ended their thirteen-year relationship and was seeing someone new. On the night before Victim's murder, he followed her and her new boyfriend. He entered Victim's home through a window at 2:00 a.m. and was found sitting in the dark. Defendant was at Victim's home at about the time of her death. He did not bring their children to her, as they had planned. He sat with Grandfather in the kitchen, though Grandfather said that it was very unusual for Defendant to sit or speak with him. Then he left the trailer suddenly and drove away very quickly. Defendant claimed that he went to a local gas station, but three attendants denied ever seeing him. When he returned to the home, he asked Grandfather to retrieve Victim.

{25} Defendant made several incriminating statements at the clinic. Primarily, without being informed of Victim's injuries, Defendant responded to Officer Martinez's inquiry about Victim being shot by saying, "I *know* . . . ." Defendant also told the officers that he probably would never be able to retire and was "fucked now."

11

**{26}** The same type of ammunition that was used to kill Victim was found in Defendant's truck and near where he had entered Victim's trailer during the night.

**{27}** Finally, while in jail, Defendant called several people in an attempt to have Officer Tommy Martinez and Grandmother change their statements more favorably to him.

**{28}** Although the evidence of Defendant's guilt is circumstantial, when it is viewed in the aggregate, it is sufficient to affirm the jury's conclusion that Defendant killed Victim with the deliberate intent to do so. It cannot be said that the jury acted irrationally in finding Defendant guilty of first degree murder beyond a reasonable doubt. Therefore, his first degree murder conviction is affirmed.

### 2. Tampering with Evidence

**{29}** Defendant also argues that there was insufficient evidence to support the jury's finding of guilt for the tampering with evidence charge. Tampering is a specific intent crime that "consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A); *State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192. Intent is subjective; because there is rarely direct evidence of intent, it is often inferred from the circumstances. *State v. Motes*, 118 N.M. at 729, 885 P.2d at 650. "When there is no other evidence of the specific intent . . . to disrupt the police investigation, intent is often inferred from an overt act of the defendant." *Duran*,

12

2006-NMSC-035, ¶ 14. If there is neither direct evidence of the defendant's specific intent to tamper, nor evidence of an overt act from which the jury may infer such intent, "the evidence cannot support a tampering conviction." *Silva*, 2008-NMSC-051, ¶ 18.

{30}     Defendant asserts that the State's theory was that since Victim was killed with a 0.22 caliber gun and no weapon was recovered, Defendant must have hid it to obstruct the investigation. He argues that there was no evidence that he owned or had access to a 0.22 caliber gun and no evidence that he undertook an overt act to disrupt the investigation. Defendant's argument is flawed as it disregards the evidence presented at trial and does not give the factfinder its proper deference.

{31}     Although there was no evidence that Defendant owned a 0.22 caliber gun, there was evidence in the record linking Defendant to a 0.22 caliber weapon: the 0.22 caliber bullet found in his truck. An empty holster was also found in Defendant's truck. Additionally, there was testimony that, at about the time of Victim's murder, Defendant was in the house, left suddenly, drove away quickly, and then returned. Based on this evidence, a rational jury could have inferred that Defendant made an overt act to either hide or dispose of the gun used in the murder. Defendant's tampering with evidence conviction is affirmed.

**III.   MOTION FOR NEW TRIAL**

{32}     Defendant argues that his constitutional right to have a fair and impartial jury was violated because the district court abused its discretion in denying his motion for

13

a new trial. He moved for a new trial on three separate grounds: (1) the trial court's failure to produce Juror for questioning, (2) failure of certain jurors to answer questions honestly during the jury selection process, and (3) improper discussion by the jury of extraneous information. We affirm and address each argument in turn.

**{33}** "Because the trial judge has observed the demeanor of the witnesses and has heard all the evidence, . . . the function of passing on motions for new trial belongs naturally and peculiarly to the trial court." *State v. Smith*, 104 N.M. 329, 333, 721 P.2d 397, 401 (1986), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989). An appellate court "will not disturb a trial court's exercise of discretion in denying or granting a motion for a new trial unless there is a manifest abuse of discretion." *State v. Moreland*, 2008-NMSC-038, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Id.* "We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted).

**A.      Failure to Produce Juror for Questioning**

**{34}** After Juror's "open and shut" comment was brought to the attention of both parties, Defendant initially took no position, then requested that Juror be produced for questioning, and finally urged that Juror be excluded from deliberations and designated an alternate. There was a brief discussion in which the State voiced its

14

objection. In spite of the fact that Defendant did not make the proper showing to have Juror substituted, *see State v. Bojorquez*, 88 N.M. 154, 156, 538 P.2d 796, 798 (Ct. App. 1975) (holding that to have a juror dismissed and substituted, a party must show (1) that the juror is unable to perform his or her duties and (2) that the juror's inability will prejudice the complaining party), and substitution was therefore not required, the cautious trial judge substituted Juror anyway. Defendant now argues that the district court's failure to produce Juror for questioning denied him of his right to a fair trial.

{35} There was no abuse of discretion in the trial court's denial of Defendant's motion for a new trial on the basis that Juror was not questioned for bias; in fact, it was properly denied. "To allow a defendant to invite error and to subsequently complain about that very error would subvert the orderly and equitable administration of justice." (internal quotation marks and citation omitted). "[A] defendant cannot be permitted . . . to reverse his previous position simply because he gambled and lost." *State v. Sanchez*, 120 N.M. 247, 252, 901 P.2d 178, 183 (1995) (internal quotation marks and citation omitted). Here, Defendant clearly advocated for substitution of Juror: "I think [Juror] should be excluded from deliberations and designated as an alternate." Thus, any error that may have occurred was invited by Defendant. The district court's denial of Defendant's motion for a new trial on the basis that he did not have the opportunity to question Juror was not an abuse of discretion.

## B.     Failure of Jurors to Disclose Information on Jury Questionnaires

{36}     Through a post-trial investigation, Defendant discovered that some of the jurors failed to disclose information on the jury questionnaires: two jurors failed to disclose drinking while intoxicated (DWI) convictions, two jurors failed to disclose that they were victims of domestic violence, two jurors failed to disclose that they were incapable of passing judgment on others, and one juror failed to disclose that she had worked at the same casino as a witness in the case. Defendant argues that his right to a fair and impartial jury was denied because these jury questionnaire omissions prevented him from meaningful questioning during the jury selection process and exercising necessary peremptory challenges. We disagree.

{37}     There was no abuse of discretion in the trial court's denial of Defendant's motion for a new trial on the basis that some of the jurors failed to disclose information on the jury questionnaires. An appellate court, which reviews a claim that alleged omissions or misrepresentations by a juror during voir dire necessitate a new trial due to a denial of the claimant's right to a fair and impartial jury, evaluates two things: (1) whether the juror's alleged omissions or misrepresentations were germane to the juror's capacity to serve as an impartial juror, and (2) whether the claimant demonstrated actual prejudice as a result of the juror in question sitting on the jury. *See State v. Pierce*, 109 N.M. 596, 599-600, 788 P.2d 352, 355-56 (1990) (plurality), *modified on other grounds by State v. Ortega*, 112 N.M. 554, 561, 817 P.2d 1196, 1203 (1991). Where there is no relationship between the juror's erroneous statements

16

and his or her capacity to sit as an impartial juror, a complaining defendant is not entitled to relief. *Id*. at 600, 788 P.2d at 356. There is no prejudice unless the juror's misrepresentations bear on possible disqualification of that juror, so that it could be asserted that the defendant's trial was conducted in an atmosphere of impartiality. *See State v. Baca*, 99 N.M. 754, 756, 664 P.2d 360, 362 (1983).

**{38}** Without explaining why, Defendant argues that the jurors' alleged omissions or misrepresentations were germane to the jurors' abilities to be fair and impartial. We conclude that the misrepresentations here—DWI convictions, history of domestic violence, inability to pass judgment, and acquaintanceship with a witness—have no relationship to the jurors' capacities to be impartial, nor do they bear on the jurors' possible disqualification or implicate the impartiality of the trial. The denial of Defendant's motion for a new trial on this basis is thereby affirmed.

**C.    Jurors' Discussion of Another Murder Trial**

**{39}** Finally, Defendant argues that he is entitled to a new trial, or at least an evidentiary hearing, based on his post-trial discovery that some of the jurors discussed a well-publicized Española murder case in which a mistrial was declared because the jury could not reach a unanimous decision. Defendant claims that this discussion tainted deliberation because jurors may have been pressured to reach unanimity in fear of letting Defendant "get away with murder." The district court ruled that pursuant to Rule 11-606(B) NMRA, Defendant could not impeach the jury's verdict.

17

{40} Rule 11-606(B) prohibits jurors from testifying to matters or statements that occurred during deliberations, with the relevant exceptions that: "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention [or] (2) whether any outside influence was improperly brought to bear upon any juror." This exception is limited to "that information that relates . . . directly to the case under consideration." *State v. Rivera*, 1997-NMCA-102, ¶ 12, 124 N.M. 211, 947 P.2d 168. In order to impeach a jury's verdict, a defendant bears the burden of showing that the jury received extraneous information and that such information "came to bear on the jury's deliberations." *State v. Mann*, 2002-NMSC-001, ¶ 19, 131 N.M. 459, 39 P.3d 124 (internal quotation marks and citation omitted).

{41} In *Rivera*, our Court of Appeals held that the defendant was not entitled to a new trial because the jurors had watched the O.J. Simpson verdict during a break from deliberation. 1997-NMCA-102, ¶ 6. The Court held that, since the jurors did not violate their instructions and because the O.J. Simpson verdict "had nothing whatsoever to do with th[e] case," the defendant was not entitled to a new trial. *Id.* ¶ 12. Rather, the Court held that the extraneous exception of the rule should be limited to "that information that relates . . . directly to the case under consideration." *Id.*

{42} *Rivera* controls the outcome here. The Española murder case, like the O.J. Simpson case in *Rivera*, had "nothing whatsoever" to do with the instant case. *Id.* To apply the Rule 11-606(B) exception here would contradict not only our recognition

of its "very limited" nature, but also our policy which "ensur[es] freedom of expression and debate, prevent[s] the harassment of jurors, insulat[es] the jury decision-making process from public pressure, and secur[es] stability within the system and finality of judgments." *State v. Mann*, 2000-NMCA-088, ¶ 84, 129 N.M. 600, 11 P.3d 564. Thus, the district court's determination that the discussion of the Española case was not extraneous and prejudicial was not an abuse of discretion. The denials of both Defendant's motions for a new trial and for an evidentiary hearing are affirmed.

## IV. CONCLUSION

{43} Based on the forgoing analysis, we affirm Defendant's first degree murder and tampering with evidence convictions and the denial of Defendant's motion for a new trial.

{44} **IT IS SO ORDERED.**


_____
**PATRICIO M. SERNA, Justice**

**WE CONCUR:**

_____

**EDWARD L. CHÁVEZ, Chief Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**RICHARD C. BOSSON, Justice**


_____

**CHARLES W. DANIELS, Justice**